Jeffrey Schreiber, Esq.
NJ Attorney ID: 041751990
**MEISTER SEELIG & FEIN LLP**
4E&F Auer Court
Williamsburg Commons
East Brunswick, New Jersey 08816
Tel: (732) 432-0073
Email: js@msf-law.com
*Attorneys for Defendants*
*Neopharma LLC and Nexgen Pharma FZ-LLC*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHANNEL TRADE FINANCE 1 SPC, ON BEHALF OF AND FOR THE ACCOUNT OF TF 1.1 SP, and CHANNEL TRADE FINANCE 2 SPC, ON BEHALF OF AND FOR THE ACCOUNT OF TF 2.1 SP, | Case No. 3:20-cv-07306-MAS-ZNQ |
| | Motion Day: May 17, 2021 |
| Plaintiffs, | |
| v. | |
| NEOPHARMA LLC and NEXGEN PHARMA FZ-LLC, | |
| Defendants. | |

**MEMORANDUM OF LAW**
**IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................. iv

I.      PRELIMINARY STATEMENT ................................................................ 1

        Subject-Matter Jurisdiction ................................................................. 3

        Personal Jurisdiction ........................................................................... 4

        The Legally Deficient Claims ............................................................. 4

II.     RELEVANT FACTS ................................................................................ 5

        The Agreements .................................................................................. 5

        Transactions Repaid by NMC ............................................................. 7

                August 1, 2019 – Neopharma ................................................. 7

                August 1, 2019 – Nexgen ........................................................ 8

                August 7, 2019 – Neopharma ................................................. 8

        Transactions Not Repaid by NMC ...................................................... 9

                November 13, 2019 – Neopharma .......................................... 9

                November 25, 2019 – Nexgen ................................................ 10

                December 17, 2019 – Nexgen ................................................ 11

III.    ARGUMENT ............................................................................................ 12

        LEGAL STANDARD .......................................................................... 12

        JURISDICTION .................................................................................... 12

        A.      This Court Lacks Subject-Matter Jurisdiction ...................... 12

        B.      This Court Lacks Personal Jurisdiction Over Defendants .................................... 15

                a.      Plaintiffs Have Not Pled Specific Jurisdiction Over Defendants ........... 16

                b.      Defendants are Not Subject to General Jurisdiction Through Their Business Associations ................................................... 17

PLAINTIFFS' COMPLAINT FAILS TO STATE A CLAIM AS A MATTER OF LAW ........................................................................................................ 20

C.      Plaintiffs Fail to State a Civil RICO Claim ............................................... 20

      a.      Plaintiffs' RICO Claim is Impermissibly Extraterritorial ......................... 21

            i.      Plaintiffs Fail to Allege Domestic Injury ....................................... 21

            ii.      Plaintiffs Fail to Allege Use of Wires in Interstate or Foreign Commerce .................................................................................. 22

      b.      Plaintiffs' Fail to Plead a Violation of Section 1962(c) ............................ 23

            i.      Plaintiffs Fail to Allege the Existence of an Enterprise ............... 23

            ii.      Plaintiffs Fail to Allege a Pattern of Racketeering Activity ......... 25

                    1.   Predicate Acts ........................................................................ 25

                    2.   Wire Fraud ............................................................................. 27

                    3.   The Continuity Requirement ................................................... 28

                        (a) Closed-Ended Continuity ................................................... 29

                        (b) Open-Ended Continuity .................................................... 30

      c.      Plaintiffs Lack RICO Standing ................................................. 31

      d.      Plaintiffs Cannot Allege a RICO Conspiracy  ........................... 32

D.      Plaintiffs Fail to State a Breach of Contract Claim ............................... 33

E.      Plaintiffs Fail to State a Breach of Covenant of Good Faith and Fair Dealing Claim .................................................................................................... 35

F.      Plaintiffs Fail to State a Claim for Fraudulent Misrepresentation ....................... 37

G.      Plaintiffs Fail to State a Claim for Negligent Misrepresentation ......................... 39

H.      Plaintiffs Fail to State a Conspiracy to Defraud Claim ......................... 41

I.      Plaintiffs Fail to State a Claim for Conversion .................................... 44

J.      The Economic Loss Doctrine Bars Plaintiffs' Tort Claims ................................. 46

K.      Plaintiffs Fail to State a Claim for Unjust Enrichment ......................... 48

9926/1/8204196.v1

IV.   CONCLUSION.................................................................................................... 50

9926/1/8204196.v1

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Absolute Power Sys., Inc. v. Cummins, Inc.*,
  2016 WL 6897782 (D.N.J. Nov. 23, 2016) ............................................................ 21, 29, 30

*Am. Rubber & Metal Hose Co. v. Strahman Valves, Inc.*,
  2011 WL 3022243 (D.N.J. July 22, 2011) ............................................................ 46

*Annulli v. Panikkar*,
  200 F.3d 189 (3d Cir. 1999) ............................................................ 27

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006) ............................................................ 31, 32

*Argabright v. Rheem Mfg. Co.*,
  201 F. Supp. 3d 578 (D.N.J. 2016) ............................................................ 38, 40

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................ 27

*Asheroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................ 12

*Banks v. Wolk*,
  918 F.2d 418 (3d Cir. 1990) ............................................................ 25, 26

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................ 12

*Bergen Beverage Distribs. LLC v. E. Distribs. I, Inc.*,
  2017 WL 5714702 (D.N.J. Nov. 28, 2017) ............................................................ 39, 41

*Bonavitacola Elec. Contr., Inc. v. Boro Developers, Inc.*,
  87 F. App'x 227 (3d Cir. 2003) ............................................................ 26

*Carfagno v. Ace, Ltd.*,
  2005 WL 1523530 (D.N.J. June 28, 2005) ............................................................ 16, 17, 18

*Caribbean Telecoms. Ltd. v. Guyana Telephone & Telegraph Co. Ltd.*,
  594 F. Supp. 2d 522 (D.N.J. 2009) ............................................................ 15

*Cedar Holdings, LLC v. Menashe*,
  2017 WL 1349321 (D.N.J. Apr. 7, 2017) ............................................................ 36

iv

*D'Amelio v. Independence Healthcom Strategies Group, Inc.*,
   2016 WL 6909102 (D.N.J. 2016)....................................................................13

*Davis v. Bankers Life & Cas. Co.*,
   2016 WL 7668452 (D.N.J. Dec. 23, 2016) ...............................................47, 48, 49

*Dep't of Envtl. Prot. v. Ventron Corp.*,
   94 N.J. 473 (1983) ..................................................................................19

*District 1199P Health and Welfare Plan v. Janssen L.P.*,
   784 F. Supp. 2d 508 (D.N.J. 2011).............................................................24

*Dresser Industries, Inc. v. Underwriters at Lloyd's of London*,
   106 F.3d 494 (3d Cir. 1997) ...............................................................12, 14

*Dutch Run–Mays Draft, LLC v. Wolf Block, LLP*,
   450 N.J. Super. 590 (2017)..................................................................16, 17

*Estate of Gleiberman v. Hartford Life Ins. Co.*,
   94 F. App'x 944 (3d Cir. 2004)..................................................................49

*Fagan v. Fischer*,
   2019 WL 5587286 (D.N.J. Oct. 30, 2019) .....................................................45

*FDASmart, Inc. v. Dishman Pharm. & Chemicals Ltd.*,
   448 N.J. Super. 195 (2016)......................................................................20

*Frederico v. Home Depot*,
   507 F.3d 188 (3d Cir. 2007) ....................................................................33

*Gehling v. St. George's Sch. of Med.*,
   773 F.2d 539 (3d Cir.1985) .....................................................................18

*Germinaro v. Fid. Nat'l Title Ins. Co.*,
   737 F. App'x 96 (3d Cir. 2018)..............................................................29, 30

*Giercyk v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
   2015 WL 7871165 (D.N.J. Dec. 4, 2015) ..................................................41, 45

*Giles v. Phelan, Hallinan & Schmieg, L.L.P.*,
   2013 WL 2444036 (D.N.J. June 4, 2013) ..................................................31, 32

*GKE Enters., LLC v. Ford Motor Credit Co. LLC USA*,
   2010 WL 2179094 (D.N.J. May 26, 2010) ....................................................37

v

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011) ...............................................................................16, 17

*Gordon v. Nice Sys., Inc.*,
   2020 WL 2316278 (D.N.J. May 11, 2020) ...............................................45

*Gratz v. Ruggiero*,
   822 F. App'x 78 (3d Cir. 2020)...........................................................23, 31

*Haim v. Neeman*,
   2012 WL 12905235 (D.N.J. Aug. 29, 2012) ............................................14

*Hanson v. Denckla*,
   357 U.S. 235 (1958) ..................................................................................18

*Hart v. Elect. Arts, Inc.*,
   740 F. Supp. 2d 658 (D.N.J. 2010).........................................................43

*Heffernan v. Hunter*,
   189 F.3d 405 (3d Cir. 1999) ....................................................................43

*Hemi Grp., LLC v. City of N.Y.*,
   559 U.S. 1 (2010) ......................................................................................31

*Heriveaux v. Durkin & Durkin LLC*,
   2020 WL 487290 (D.N.J. Jan. 30, 2020) ...........................................44, 46

*Heyman v. Citimortgage, Inc.*,
   2019 WL 2642655 (D.N.J. June 27, 2019) ..............................................49

*H.J. Inc. v. Nw. Bell Tel. Co.*,
   492 U.S. 229 (1989) ............................................................................29, 30

*Hollis-Arrington v. PHH Mortg. Corp.*,
   2005 WL 3077853 (D.N.J. Nov. 15, 2005).............................................25

*Holmes v. Sec. Investor Prot. Corp.*,
   503 U.S. 258 (1992) ..................................................................................33

*Humphrey v. GlaxoSmithKline PLC*,
   905 F.3d 694 (3d Cir. 2018) ................................................................21-22

*IMO Indus., Inc. v. Kiekert AG*,
   155 F.3d 254 (3d Cir. 1998) ....................................................................16

9926/1/8204196.v1

*In re Aetna UCR Litig.*,
  2015 WL 3970168 (D.N.J. June 30, 2015) ............................................................31

*In re Gen. Motors LLC Ignition Switch Litig.*,
  339 F. Supp. 3d 262 (S.D.N.Y. 2018) ...........................................................48, 49

*In re Suprema Specialties, Inc.*,
  438 F.3d 256 (3d Cir. 2006) ..................................................................................40

*J. McIntyre Mach., Ltd.v. Nicastro*,
  564 U.S. 873 (2011) ..............................................................................................16

*Jackson v. Twentyman*,
  27 U.S. 136 (1829) ................................................................................................14

*K&H Business Consultants Ltd. v. Cheltonian, Ltd.*,
  567 F. Supp. 420 (D.N.J. 1983) ......................................................................13, 14

*Kaul v. Christie*,
  372 F. Supp. 3d 206 (D.N.J. 2019)...........................................................22, 23, 27

*Kolar v. Preferred Real Estate Invs., Inc.*,
  361 F. App'x 354 (3d Cir. 2010).............................................................................21

*Kramer v. Caribbean Mills, Inc.*,
  394 U.S. 823 (1969) ..............................................................................................14

*Lightning Lube, Inc. v. Witco Corp.*,
  4 F.3d 1153 (3d Cir. 1993).....................................................................................33

*Lincoln Ben. Life Co. v. AEI Life, LLC*,
  800 F.3d 99 (3d Cir. 2015) .............................................................................13, 14

*Lucas v. Gulf & W. Indus., Inc.*,
  666 F.2d 800 (3d Cir. 1981) ..................................................................................19

*Mathew v. Specializing Loan Servs.*,
  2018 WL 6696776 (D.N.J. Dec. 20, 2018) ...........................................................35

*Meng v. Du*,
  2020 WL 4593273 (D.N.J. Aug. 2020)..................................................................47

*Mid-Am. Salt, LLC v. Morris Cty. Coop. Pricing Council*,
  2018 WL 999675 (D.N.J. Feb. 20, 2018)........................................................34, 35

9926/1/8204196.v1

*Miller v. Burt,*
    765 F. App'x 834 (3d Cir. 2019) ...................................................................21, 27

*Mineo v. McEachern,*
    2014 WL 2197032 (D.N.J. May 27, 2014) ...........................................................25

*M.N.H. Exports v. B.A.T. Wear, Inc.,*
    2009 WL 427524 (D.N.J. Feb. 20, 2009) .............................................................14

*Naty Samra v. Rehrig Pacific Co.,*
    2018 WL 2049269 (D.N.J. April 16, 2018) ..........................................................19

*Neuss v. Rubi Rose, LLC,*
    2017 WL 2367056 (D.N.J. May 31, 2017) ......................................................39, 50

*N.V.E., Inc. v. Palmeroni,*
    2015 WL 13649814 (D.N.J. Feb. 23, 2015) .........................................................33

*Ottilio v. Valley Nat'l Bancorp,*
    591 F. App'x 167 (3d Cir. 2015) ..........................................................................27

*Paradise Hotel Corp. v. Bank of Nova Scotia,*
    842 F.2d 47 (3d Cir. 1988) ...................................................................................40

*Peloro v. U.S.,*
    488 F.3d 163 (3d Cir. 2007) .................................................................................44

*Pfundstein v. Omnicom Grp. Inc.,*
    285 N.J. Super. 245 (1995) ...................................................................................19

*Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.,*
    449 F. Supp. 3d 449 (D.N.J. 2020) ............................................................. 47, 49-50

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993) .............................................................................................24

*Ricketti v. Barry,*
    2015 WL 1013547 (D.N.J. Mar. 9, 2015) ......................................................36, 37

*RJR Nabisco, Inc. v. European Cmty.,*
    136 S. Ct. 2090 (2016) ....................................................................................22, 23

*Saba v. Am. Family Life Assurance Co. of Columbus,*
    2017 WL 3169056 (D.N.J. July 26, 2017) ..........................................................35

*Sani-Pure Food Labs., LLC v. bioMerieux, Inc.*,
　　2014 WL 6386803 (D.N.J. Nov. 13, 2014) ............................................................40

*Scholes Elec. & Commc'ns, Inc. v. Fraser*,
　　2006 WL 1644920 (D.N.J. June 14, 2006) ....................................................45, 46

*Sedima, S.P.R.L v. Imrex Co.*,
　　473 U.S. 479 (1985) ..........................................................................................23, 31

*Seltzer v. I.C. Optics, Ltd.*,
　　339 F. Supp. 2d 601 (D.N.J. 2004).......................................................................19

*Shotmeyer v. N.J. Realty Title Ins. Co.*,
　　195 N.J. 72 (2008) ................................................................................................20

*Smart v. Winslow*,
　　2015 WL 5455643 (D.N.J. Sept. 16, 2015).........................................................24

*Sons of Thunder, Inc. v. Borden, Inc.*,
　　690 A.2d 575 (N.J. 1997) ................................................................................35-36

*Spano v. JP Morgan Chase Bank, NA*,
　　521 F. App'x 66 (3d Cir. 2013)............................................................................48

*Spitz v. Medco Health Sols., Inc.*,
　　2010 WL 4615233 (D.N.J. Nov. 3, 2010).......................................................43, 44

*Stockroom, Inc. v. Dydacomp Dev. Corp.*,
　　941 F. Supp. 2d 537 (D.N.J. 2013).......................................................................38

*Stranahan Gear Co., Inc. v. NL Indus.*,
　　800 F.2d 53 (3d Cir. 1986) ...................................................................................18

*Sugg v. Virtusa Corp.*,
　　2019 WL 1924855 (D.N.J. Apr. 30, 2019)...........................................................12

*Swift v. Pandey*,
　　2013 WL 6054853 (D.N.J. Nov. 13, 2013)...........................................................42

*Tabas v. Tabas*,
　　47 F.3d 1280 (3d Cir. 1995).........................................................................21, 29

*Tedeschi v. Smith*,
　　2010 WL 148424 (D.N.J. Jan. 12, 2010) ......................................................24, 25

9926/1/8204196.v1

*Time Share Vacation Club v. Atlantic Resorts, Ltd.*,
    735 F.2d 61 (3d Cir. 1984) ....................................................................18

*Torsiello v. Strobeck*,
    955 F. Supp. 2d 300 (D.N.J. 2013) .................................................39, 40

*U.S. v. Parise*,
    159 F.3d 790 (3d Cir. 1998) ..................................................................25

*Verni ex rel. Burstein v. Harry M. Stevens, Inc.*,
    387 N.J. Super. 160 (2006) ....................................................................19

*Wade v. Kessler Inst.*,
    172 N.J. 327 (2002) ...............................................................................36

*Warden v. McLelland*,
    288 F.3d 105 (3d Cir. 2002) ..................................................................27

*W.H.P.M., Inc. v. Immunostics, Inc.*,
    2020 WL 359146 (D.N.J. Jan. 22, 2020) ...............................................44

*Wiatt v. Winston & Strawn LLP*,
    838 F. Supp. 2d 296 (D.N.J. 2012) .................................................41, 42

*Wilkins v. ING Bank FSB*,
    2011 WL 3913120 (D.N.J. Sept. 1, 2011) ..............................................40

## Statutes

Fed. R. Civ. P. § 12(b) *et seq.* ......................................................................1, 5

Fed. R. Civ. P. § 1332, *et seq.* ...................................................................*Passim*

Defendants, Neopharma LLC ("Neopharma") and Nexgen Pharma FZ-LLC ("Nexgen," collectively "Defendants"), respectfully submit this Memorandum of Law in support of their Motion to Dismiss the Complaint (Dkt. No. 1) ("Complaint" or "Compl.") filed by Plaintiffs[1] for (i) lack of this Court's subject-matter jurisdiction (Fed. R. Civ. P. § 12(b)(1)), (ii) lack of personal jurisdiction over Defendants (Fed. R. Civ. P. § 12(b)(2)), and (iii) failure to state a claim upon which relief can be granted (Fed. R. Civ. P. § 12(b)(6)).[2]

## I.  **PRELIMINARY STATEMENT**

The action arises from a supply chain financing (also known as reverse factoring)[3] contract dispute.  Plaintiffs provide short-term financing to large-scale buyers and sellers to assist them in avoiding supply chain disruption.  The Complaint's own allegations admit that the Plaintiffs' customer and the exclusive party with repayment obligations under the applicable reverse factoring agreements is non-party NMC Healthcare LLC ("NMC").  If the Plaintiffs' non-payment allegations are true – it should sue NMC – not the Defendants who were pharmaceutical suppliers to NMC and by the Complaint's own admissions never sent the alleged

---

[1]  Channel Trade Finance 1 SPC (on behalf of and for the benefit of TF 1.1 SP) ("CTF1") and Channel Trade Finance 2 SPC (on behalf of and for the benefit of TF 2.1 SP) ("CTF2," with CTF1, "Plaintiffs" or the "Channel Entities").

[2]  Neopharma's motion to dismiss is supported by the Declaration of Dr. Bavaguthu Raghuram Shetty ("Shetty Decl.").  Nexgen has filed the Declaration of Kambham Raveendranath Reddy in support of its motion to dismiss ("Reddy Decl.").

[3]  Reverse factoring refers to a concept of when a company (here, non-party NMC Healthcare LLC) contracts with a financial institution (e.g., the Plaintiffs) to pay its suppliers (Defendants) at a faster rate, in exchange for a discount on the supplier's invoices to the company.  This arrangement allows the suppliers access to immediate cash so they can continue supplying to the company.  In other words, it is referred to as "supply chain financing" because it attempts to avoid disruption in the supply chain, *i.e.*, attempts to avoid a situation where a supplier is forced to slow or stop production while it awaits payment on its invoices.  Although the precise terms vary, often the supplier is paid immediately by the financing firm on its invoices to the company, usually at a five (5) percent discount on the invoice, and then within (typically) 120 days, the company pays the financing company the full value of the invoice.

fictitious invoices to Plaintiffs.  In fact, the Complaint's own allegations concede that Defendants never even communicated with Plaintiffs concerning said invoices (or at all for that matter) prior to Plaintiffs making payments purportedly on behalf of NMC in respect of the invoices in dispute.

Regardless, the Complaint's threadbare allegations against the Defendants should be dismissed in their entirety for lack of subject matter jurisdiction, lack of personal jurisdiction and because Plaintiffs have failed to allege claims as to the Defendants upon which relief can be granted.

As explained below, the Complaint identifies six (6) separate instances where (i) NMC provided Plaintiffs with what are purported to be a Neopharma/Nexgen invoice issued to NMC for pharmaceuticals, (ii) NMC requested that Plaintiffs pay the purported Neopharma/Nexgen invoice to Neopharma/Nexgen on behalf of NMC, and (iii) Plaintiffs paid Neopharma/Nexgen on the purported Neopharma/Nexgen invoice, less a contractually agreed-upon invoice discount. The Complaint further alleges that on three (3) of these six (6) occasions NMC repaid Plaintiffs on the full amount of the invoice, but on the other three (3) occasions NMC failed to repay Plaintiffs.

As demonstrated in exhibits attached to the Complaint, however, Neopharma/Nexgen assert that the unpaid invoices in question are fraudulent, as they were issued by NMC without the knowledge or consent of Neopharma/Nexgen and, in addition, it is not Neopharma/Nexgen's contractual obligation to repay the invoices (real or fake); that responsibility lies exclusively with NMC.[4]  Moreover, it is undisputed that NMC, not Neopharma/Nexgen, provided the relevant

---

[4]  Defendants deny that either Neopharma or Nexgen retained those payments.  However, Plaintiff's claims are legally deficient even if the Complaint's allegations are taken as true as they must at the motion to dismiss stage.

invoices to Plaintiffs, and it is also undisputed that under the terms of Plaintiffs' separate contracts with Neopharma and Nexgen, neither Neopharma nor Nexgen are obligated to repay any money to Plaintiffs for any such invoice payments made to Neopharma/Nexgen by Plaintiffs. In sum, Plaintiffs have sued Defendants even though non-party NMC breached its contractual obligation to repay money NMC owes to Plaintiffs.

**Subject-Matter Jurisdiction**

This Court lacks subject-matter jurisdiction over this dispute.   As explicitly set forth in the Complaint, all parties are foreign entities (and thus foreign citizens for jurisdictional purposes), as Plaintiffs are both Cayman Islands entities (Compl. ¶¶2-3), and Defendants are both United Arab Emirates (UAE) entities (Compl. ¶¶4-5).   The only basis for this Court's jurisdiction as pled in the Complaint is diversity of citizenship, pursuant to Fed. R. Civ. P. §§ 1332(a)(2) and (a)(3) ("Section 1332").   The law is well-settled that where an action involves only foreign citizens, the federal district courts cannot maintain jurisdiction under Section 1332.

In an apparent effort to cure this defect, the Complaint alleges that Neopharma has a "designated United States office" in Princeton, New Jersey, and is thus a "citizen of New Jersey."   Compl. ¶¶4, 6.   However, as set forth in the Shetty Declaration, Neopharma has no presence in the United States, no legal, financial, or operational connection to Neopharma Inc. and has no such *designated* office in New Jersey, nor anywhere else in the United States.   *See* Shetty Decl. at ¶¶3-6.

With respect to Nexgen, the Complaint does not assert any connection to New Jersey, nor any other State in the United States.   Moreover, Nexgen has no presence in, or connection to, New Jersey, nor any State in the United States.   *See* Reddy Decl. at ¶¶3-6, dated February 10,

2021.  Therefore, Section 1332 cannot be relied upon to invoke this Court's jurisdiction over a dispute between four (4) foreign entities, where not a single party is a U.S. citizen.

**Personal Jurisdiction**

Even if the Court had subject-matter jurisdiction over the dispute, which it does not, this Court lacks personal jurisdiction over Defendants, as (i) Defendants are both foreign entities with no presence in the United States, and (ii) Defendants' conduct alleged in the Complaint has no connection to the State of New Jersey whatsoever.  The Complaint lacks a section on personal jurisdiction and makes no allegations as to specific jurisdiction under New Jersey's relevant long-arm statute.  Instead, the only personal jurisdictional averments in the Complaint appear to be that (i) Neopharma has a "designated United States office" in Princeton, New Jersey, with its wholly-owned subsidiary (non-party Neopharma Inc.) located at the same Princeton, New Jersey address, and (ii) that Nexgen is a "joint venture between Hetero Group of India and Neopharma." Compl. ¶¶4-5.  As noted above, the jurisdictional allegations with respect to Neopharma are false, and with respect to Nexgen the jurisdictional allegation is meaningless.

As set forth in the Neopharma Declaration, Neopharma has no presence anywhere in the United States and the dispute herein has no connection whatsoever to the State of New Jersey. *Id.*, at ¶¶3-8.  Similarly, as set forth in the Nexgen Declaration, Nexgen has no presence anywhere in the United States and the dispute herein has no connection whatsoever to the State of New Jersey.  *Id.*, at ¶¶3-8.  Therefore, there is no basis for this Court to assert personal jurisdiction over the Defendants.

**The Legally Deficient Claims**

Even if the Court determines that it has subject-matter jurisdiction over this dispute, and personal jurisdiction over Defendants, each of the Plaintiffs' causes of action fails to adequately

4

state a claim pursuant to Fed. R. Civ. P. § 12(b)(6).  The dispute is governed by separate contractual relationships between Plaintiffs and Defendants (Compl. ¶20).    Moreover, any money owed back to Plaintiffs—with respect to Plaintiffs' financing of the alleged transactions at issue—is the contractual obligation of non-party NMC, not Neopharma or Nexgen.

Recognizing this fatal flaw in their contractual claims, Plaintiffs assert tort claims sounding in fraud, misrepresentation, and conversion—along with an unjust enrichment claim and even a RICO claim—in a desperate attempt to recover money from Defendants which Defendants simply do not, and never did, owe to Plaintiffs.  As set forth in more detail below, each of these non-contractual claims is facially deficient because the relationship between Plaintiffs and Defendants was entirely contractual, but also because—after the Supplier Agreements were executed—Plaintiffs and Defendants had no direct contact regarding the disputed transactions, as all such communications and — more importantly, all representations— were made to Plaintiffs by NMC.  Indeed, the Complaint's own exhibits clearly show that Plaintiffs had no contact with the Defendants except for two post-payment attempts at confirming the genuineness of the invoices submitted by NMC to Plaintiffs, which Defendants promptly denied.

## II.    <u>RELEVANT FACTS</u>

**The Agreements**

On or about July 30, 2019, NMC (a healthcare services provider in the UAE) entered into a reverse factoring agreement with Plaintiffs ("NMC Agreement" or "Customer Agreement"). Compl. ¶¶ 9, 16.  On or about July 30, 2019, Neopharma and Nexgen each entered into separate agreements with CTF2 (*i.e.*, the Supplier Agreements) concerning the payment to Neopharma/Nexgen for Neopharma/Nexgen invoices issued to NMC.  Compl. ¶20.

Under the terms of Plaintiffs' agreements with NMC and Neopharma/Nexgen, (i) NMC was obligated to identify and present certain of its Neopharma/Nexgen invoices to Plaintiffs, (ii) NMC was obligated to request that Plaintiffs pay Neopharma/Nexgen on those invoices, (iii) Plaintiffs were obligated to pay Neopharma/Nexgen on the invoices identified by NMC in exchange for an agreed-upon (5.05 percent) discount, and (iv) NMC was obligated to repay Plaintiffs the full amount of the identified invoices (*i.e.*, the amount paid by Plaintiffs, plus 5.05 percent).  Compl. ¶¶16-21, Exs. 1-3.

All payments from Plaintiffs to Neopharma/Nexgen, and all repayments from NMC to Plaintiffs were to be made in U.S. Dollars.  Compl., Exs. 1-3.  For payments from Plaintiffs to Neopharma, Neopharma identified its beneficiary bank as the Arab Bank for Investment and Foreign Trade (Al Masraf), in Abu Dhabi, UAE, with its correspondent bank as the Bank of New York, in New York City.  Compl., Ex. 2.  Neopharma identified its primary contact as Vivek Bhatt, in Abu Dhabi, UAE.  Compl., Ex. 2.  CTF2 identified its primary contact as Aaron Bennett, in Grand Cayman, Cayman Islands.  Compl., Ex. 2.

For payments from Plaintiffs to Nexgen, Nexgen identified its beneficiary bank as the Bank of Baroda, in Dubai, UAE, with its correspondent bank as the Bank of Baroda, in New York City.  Compl., Ex. 3.  Nexgen identified its primary contact as Siby Mathew, in Dubai, UAE.  Compl., Ex. 3.  CFT2 identified its primary contact as Aaron Bennett, in Grand Cayman, Cayman Islands.  Compl., Ex. 3.

For payments from NMC to Plaintiffs, Plaintiffs identified its beneficiary bank as the Bank of New York Mellon, in London, England, with its correspondent bank as the Bank of New York, in New York City.  Compl., Ex. 1.  Plaintiffs identified their primary contact as Aaron Bennett, in Grand Cayman, Cayman Islands.  Compl., Ex. 1.

In the Supplier Agreements, the parties submitted to the non-exclusive jurisdiction of the English courts. Compl., Exs. 2-3. In the NMC Agreement, Plaintiffs and NMC submitted to the non-exclusive jurisdiction of the courts of England and Wales. Compl., Ex. 1.

**Transactions Repaid by NMC**

<u>August 1, 2019—Neopharma</u>

On or about August 1, 2019, NMC sent an e-mail to CTF2 containing an invoice purported to have been issued by Neopharma. Compl. ¶24. NMC requested that Plaintiffs make payment on the invoice directly to Neopharma in accordance with the NMC Agreement. Compl. ¶24. The (purported) Neopharma invoice was for eleven (11) different lots of pharmaceutical items, with a total price of $2,969,505.20. Compl., ¶25, Ex. 4. The invoice identified Neopharma, at its Abu Dhabi, UAE address, as the seller, and NMC, at its Abu Dhabi, UAE address, as the purchaser. Compl., Ex 4.

Under the terms of the separate NMC and Neopharma agreements with Plaintiffs, Plaintiffs were obligated to immediately pay Neopharma $2,909,565.22 (the invoice amount, less the agreed-upon discount). Compl. ¶25. In turn, NMC was obligated to repay Plaintiffs $2,969,505.20 (the full amount of the invoice). Compl. ¶25.

On or about August 1, 2019, Plaintiffs wired Neopharma $2,909,565.22 to Neopharma's bank in Abu Dhabi, from Plaintiffs' bank in London, England (via a New York City correspondent bank). Compl. ¶26. On or about November 12, 2019, NMC wired Plaintiffs $2,969,505.20 from NMC's Bank of Baroda account, to Plaintiffs' bank in London, England, completing the transaction on this invoice. Compl. ¶27.

<u>August 1, 2019—Nexgen</u>

On or about August 1, 2019, NMC sent an e-mail to CTF2 containing an invoice purported to have been issued by Nexgen.  Compl. ¶28.  NMC requested that Plaintiffs make payment on the invoice directly to Nexgen in accordance with the NMC Agreement.  Compl. ¶28.  The (purported) Nexgen invoice was for eight (8) different lots of pharmaceutical items, with a total price of $2,644,432.00.  Compl., ¶29, Ex. 10.  The invoice identified Nexgen, at its Dubai, UAE address, as the seller, and NMC, at its Abu Dhabi, UAE address, as the purchaser. Compl., Ex. 10.

Under the terms of the separate NMC and Nexgen agreements with Plaintiffs, Plaintiffs were obligated to immediately pay Nexgen $2,587,031.21 (the invoice amount, less the agreed-upon discount).  Compl. ¶29.  In turn, NMC was obligated to repay Plaintiffs $2,644,432.00 (the full amount of the invoice).   Compl. ¶29.

On or about August 1, 2019, Plaintiffs wired Nexgen $2,587,031.21 to Nexgen's bank in Dubai, from Plaintiffs' bank in London, England (via a correspondent bank in New York City). Compl. ¶30, Ex. 12.  On or about November 20, 2019, NMC wired Plaintiffs $2,644,432.00 (as part of a larger transaction) from NMC's Bank of Baroda account, to Plaintiffs' bank in London, England, completing the transaction on this invoice.  Compl. ¶31.

<u>August 7, 2019—Neopharma</u>

On or about August 7, 2019, NMC sent an e-mail to CTF2 containing an invoice purported to have been issued by Neopharma.  Compl. ¶32.  NMC requested that Plaintiffs make payment on the invoice directly to Neopharma in accordance with the NMC Agreement.  Compl. ¶32.  The (purported) Neopharma invoice was for nine (9) different lots of pharmaceutical items, with a total price of $152,679.59.  Compl., ¶32, Ex. 15.  The invoice identified Neopharma, at its

Abu Dhabi, UAE address, as the seller, and NMC, at its Abu Dhabi, UAE address, as the purchaser.  Compl., Ex 15.

Under the terms of the separate NMC and Neopharma agreements with Plaintiffs, Plaintiffs were obligated to immediately pay Neopharma $149,325.95 (the invoice amount, less the agreed-upon discount).  Compl. ¶33.  In turn, NMC was obligated to repay Plaintiffs $152,679.59 (the full amount of the invoice).  Compl. ¶33.

On or about August 7, 2019, Plaintiffs wired Neopharma $149,325.95 to Neopharma's bank in Abu Dhabi, from Plaintiffs' bank in London, England (via a New York City correspondent bank).  Compl. ¶34.  On or about November 26, 2019, NMC wired Plaintiffs $152,679.59 from NMC's Bank of Baroda account, to Plaintiffs' bank in London, England, completing the transaction on this invoice.  Compl. ¶35.

In sum, none of the reverse factoring transactions, for which the Plaintiffs were repaid by NMC had any connection or nexus to New Jersey.

**Transactions Not Repaid by NMC**

<u>November 13, 2019—Neopharma</u>

On or about November 13, 2019, NMC sent an e-mail to CTF2 containing an invoice purported to have been issued by Neopharma.  Compl. ¶36.  NMC requested that Plaintiffs make payment on the invoice directly to Neopharma in accordance with the NMC Agreement.  Compl. ¶36.  The (purported) Neopharma invoice was for fifteen (15) different lots of pharmaceutical items, with a total price of $3,010,299.50.  Compl., ¶37, Ex. 21.  The invoice identified Neopharma, at its Abu Dhabi, UAE address, as the seller, and NMC, at its Abu Dhabi, UAE address, as the purchaser.  Compl., Ex 21.

Under the terms of the separate NMC and Neopharma agreements with Plaintiffs, Plaintiffs were obligated to immediately pay Neopharma $2,909,439.00 (the invoice amount, less the agreed-upon discount).   Compl. ¶37.   In turn, NMC was obligated to repay Plaintiffs $3,010,299.50 (the full amount of the invoice).   Compl. ¶37.

On or about November 13, 2019, Plaintiffs wired Neopharma $2,909,439.00 to Neopharma's bank in Abu Dhabi, from Plaintiffs' bank in London, England (via a New York City correspondent bank).  Compl. ¶38.

To date, NMC has not repaid Plaintiffs on this transaction.   Suspecting that this invoice was a forgery, on or about March 11, 2020, Plaintiffs e-mailed Neopharma to inquire about the legitimacy of this invoice.   On or about March 15, 2020, Neopharma confirmed Plaintiffs' suspicions that the invoice herein was "not Neopharma's [i]nvoice."  Compl., Ex. 40.

<u>November 25, 2019—Nexgen</u>

On or about November 25, 2019, NMC sent an e-mail to CTF2 containing an invoice purported to have been issued by Nexgen.   Compl. ¶40.   NMC requested that Plaintiffs make payment on the invoice directly to Nexgen in accordance with the NMC Agreement.   Compl. ¶40.  The (purported) Nexgen invoice was for twelve (12) different lots of pharmaceutical items, with a total price of $4,078,139.00.  Compl., ¶40, Ex. 26.  The invoice identified Nexgen, at its Dubai, UAE address, as the seller, and NMC, at its Abu Dhabi, UAE address, as the purchaser. Compl., Ex. 26.

Under the terms of the separate NMC and Nexgen agreements with Plaintiffs, Plaintiffs were obligated to immediately pay Nexgen $3,940,741.58 (the invoice amount, less the agreed-upon discount).  Compl. ¶41.   In turn, NMC was obligated to repay Plaintiffs $4,078,139.00 (the full amount of the invoice).   Compl. ¶41.

On or about November 25, 2019, Plaintiffs wired Nexgen $3,940,741.58 to Nexgen's bank in Dubai, from Plaintiffs' bank in London, England (via a correspondent bank in New York City).  Compl. ¶42, Ex. 29.

To date, NMC has not repaid Plaintiffs on this transaction.  Suspecting that this invoice was a forgery, on or about March 11, 2020, Plaintiffs e-mailed Nexgen to inquire about the legitimacy of this invoice.  On or about March 15, 2020, Nexgen confirmed Plaintiffs' suspicions that the invoice herein was "not Nexgen Pharma's invoice."  Compl., Ex. 41.

December 17, 2019—Nexgen

On or about December 17, 2019, NMC sent an e-mail to CTF2 containing an invoice purported to have been issued by Nexgen.  Compl. ¶44.  NMC requested that Plaintiffs make payment on the invoice directly to Nexgen in accordance with the NMC Agreement.  Compl. ¶44.  The (purported) Nexgen invoice was for seven (7) different lots of pharmaceutical items, with a total price of $154,942.  Compl., ¶44, Ex. 31.  The invoice identified Nexgen, at its Dubai, UAE address, as the seller, and NMC, at its Abu Dhabi, UAE address, as the purchaser.  Compl., Ex. 31.

Under the terms of the separate NMC and Nexgen agreements with Plaintiffs, Plaintiffs were obligated to immediately pay Nexgen $149,721.82 (the invoice amount, less the agreed-upon discount).  Compl. ¶45.  In turn, NMC was obligated to repay Plaintiffs $154,942.00 (the full amount of the invoice).  Compl. ¶45.

On or about December 17, 2019, Plaintiffs wired Nexgen $149,721.82 to Nexgen's bank in Dubai, from Plaintiffs' bank in London, England (via a correspondent bank in New York City).  Compl. ¶46, Ex. 34.

To date, NMC has not repaid Plaintiffs on this transaction.  Suspecting that this invoice was a forgery, on or about March 11, 2020, Plaintiffs e-mailed Nexgen to inquire about the legitimacy of this invoice.  On or about March 15, 2020, Nexgen confirmed Plaintiffs' suspicions that the invoice herein was "not Nexgen Pharma's invoice."  Compl., Ex. 41.

In sum, none of the above transactions for which Plaintiffs have not received repayment have a connection or nexus to New Jersey.

## III.    ARGUMENT

LEGAL STANDARD

To survive a motion to dismiss, a complaint must "contain sufficient factual matter that states a claim to relief that is plausible on its face."  *Sugg v. Virtusa Corp.*, 2019 WL 1924855, at *2 (D.N.J. Apr. 30, 2019) (Shipp, D.J.) (citing *Asheroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  In construing the complaint, a "court must accept as true all well pled factual allegations in a complaint *but not mere labels and conclusions.*"  *Id.* (emphasis added).

JURISDICTION

### A.    This Court Lacks Subject-Matter Jurisdiction

This action is between exclusively foreign Plaintiffs, and at least one foreign defendant (Nexgen).  Therefore, this dispute has foreign citizens on both sides of the controversy with only one—at best—U.S. citizen (Neopharma) named as a party.  As such, this Court does not have subject-matter jurisdiction over the controversy.  *See Dresser Industries, Inc. v. Underwriters at Lloyd's of London*, 106 F.3d 494, 499 (3d Cir. 1997) (Section 1332 "only grants jurisdiction in

cases between aliens and citizens.  Cases between aliens on one side and aliens and citizens on the other, therefore, does not fit the jurisdictional pigeonhole."); *K&H Business Consultants Ltd. v. Cheltonian, Ltd.*, 567 F. Supp. 420, 421 (D.N.J. 1983) (same).  The Complaint readily admits that Plaintiffs are "citizen[s] of the Cayman Islands" (Compl. ¶6) and the Complaint does not contain a single allegation that Nexgen is anything but a citizen of the UAE (Compl. ¶5).  With respect to Neopharma, although the Complaint baselessly concludes that Neopharma—purportedly through its non-party subsidiary—is "a citizen of New Jersey," the Complaint is devoid of allegations in support of this naked conclusion.  Compl ¶6.[5]

Section 1332(c) states, in relevant part, that a corporate entity "shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business," but, with respect to limited liability companies, such as Neopharma, citizenship is determined by the citizenship of its members." *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015).  Instead of addressing the citizenship of Neopharma's members, however, the Complaint simply states that Neopharma was "incorporated with limited liability and having its designated United States office [in Princeton, New Jersey] and place of business in . . . Abu Dhabi, UAE."  Compl. ¶4.  Nowhere in the Complaint do the Plaintiffs even attempt to identify Neopharma's members, much less any member's citizenship.  For this reason alone, the Complaint should be dismissed because the Court—from the face of the Complaint—is unable to determine if it has subject-matter jurisdiction.  *See D'Amelio v. Independence Healthcom Strategies Group, Inc.*, 2016 WL 6909102, at *2, fn.2 (D.N.J. 2016) ("In the case of pleading the citizenship of unincorporated

---

[5] As noted above and as set forth in the Shetty Declaration (¶¶3-6), Neopharma has no presence in the United States and there is no basis to consider it a citizen of any U.S. State.  But even if Neopharma was "a citizen of New Jersey," which it is not, this Court would still lack subject matter jurisdiction because of Nexgen's existence as a co-defendant.

association's members, Rule 11 requires that party 'consult the sources at its disposal, including court filings and other public records before making conclusory, good faith allegations of complete diversity.") (citing *Lincoln Ben. Life*, 800 F.3d at 108).

Notwithstanding the facial deficiencies of the Complaint with regard to pleading citizenship, however, and regardless of whether Neopharma is considered a foreign citizen, a citizen of New Jersey, or a citizen of any other U.S. State, this Court lacks subject matter jurisdiction. Moreover, if Neopharma is determined to be a foreign citizen, which it is, then this action is exclusively between foreign citizens. It is black-letter law that federal district courts do not have subject-matter jurisdiction over disputes entirely between foreign citizens. *K&H Business Consultants*, 567 F. Supp. at 421 ("The Supreme Court has ruled that there is no federal jurisdiction over actions solely between aliens.") (citing *Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823, 824 n. 2 (1969), and *Jackson v. Twentyman*, 27 U.S. 136 (1829)); *see also Haim v. Neeman*, 2012 WL 12905235, at *5 (D.N.J. Aug. 29, 2012) (same); *M.N.H. Exports v. B.A.T. Wear, Inc.*, 2009 WL 427524, at *2 (D.N.J. Feb. 20, 2009) (same).

Similarly, even if Neopharma is determined to be a citizen of a U.S. State (or a dual citizen of a U.S. State and a foreign state), this Court lacks subject-matter jurisdiction over the controversy under Sections 1332(a)(2) and (a)(3). Section 1332(a)(2) states, in relevant part, that federal district courts shall have original jurisdiction where the matter in controversy exceeds $75,000, and the action is between "citizens of a State and citizens or subjects of a foreign state." *Id*. Under Third Circuit precedent, however, Section 1332(a)(2), like Section 1332(a)(1), requires complete diversity in order to be invoked. Therefore, if there are foreign citizens on both sides on the action, complete diversity is lacking, and Section 1332(a)(2) is inapplicable. *See Dresser*, 106 F.3d at 499. Here, even under the best-case scenario for Plaintiffs, the dispute

14

involves foreign citizens as Plaintiffs, a "citizen of the United Arab Emirates" in Nexgen as one defendant (Compl. ¶7), and a purported "citizen of New Jersey" (Compl. ¶6) as the other defendant.  Such a party alignment cannot support jurisdiction in this Court pursuant to Section 1332(a)(2).

Plaintiffs' attempt to invoke jurisdiction under Section 1332(a)(3) is equally unavailing. Section 1332(a)(3) states, in relevant part, that federal district courts shall have original jurisdiction where the matter in controversy exceeds $75,000, and the action is between "citizens of different States and in which citizens or subjects of a foreign state are additional parties."  *Id*. As is made clear from the text, Section 1332(a)(3) is only applicable where an action involves a dispute between "citizens of different States," in which one or more named parties are foreign citizens.  Where, as here, there is only one (purported) U.S. Citizen as a named party, the "minimal diversity requirement" is not met and Section 1332(a)(3) cannot be invoked. *Caribbean Telecoms. Ltd. v. Guyana Telephone & Telegraph Co. Ltd.*, 594 F. Supp. 2d 522, 530 (D.N.J. 2009) (finding that Section 1332(a)(3) requires that at least one U.S. citizen be named as a party on each side of the controversy).

In sum, even accepting as true the unfounded (and false) conclusion that Neopharma is a "citizen of New Jersey," this Court still lacks jurisdiction over the subject-matter because Plaintiffs and Nexgen are foreign citizens—on opposite sides of the controversy—and Neopharma, as pled, would be the only party that is a citizen of a U.S. State.

**B.      This Court Lacks Personal Jurisdiction Over Defendants**

Plaintiffs have failed to plead that this Court has personal jurisdiction over either Neopharma or Nexgen.  As set forth in the Complaint, both Neopharma and Nexgen are foreign

companies (Compl. ¶¶4-5).   Therefore, in order to exercise personal jurisdiction over the Defendants, "a federal court sitting in diversity must undertake a two-step inquiry.  First, the court must apply the relevant state long-arm statute to see if it permits the exercise of personal jurisdiction; then, the court must apply the precepts of the Due Process Clause of the Constitution.  In New Jersey, this inquiry is collapsed into a single step because the New Jersey long-arm statute permits the exercise of personal jurisdiction "to the fullest limits of due process."  *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 258–59 (3d Cir. 1998).

Under U.S. Supreme Court jurisprudence, there are two bases for a district court to acquire personal jurisdiction over a foreign entity: specific and general.  *Dutch Run–Mays Draft, LLC v. Wolf Block, LLP*, 450 N.J. Super. 590, 598 (2017) (citing, *inter alia*, *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011)); *Carfagno v. Ace, Ltd.*, 2005 WL 1523530, at *5 (D.N.J. June 28, 2005).  In order to invoke specific jurisdiction, a plaintiff must plead that the "cause of action arises directly out of a defendant's contacts with the forum state." *Id.* at 598-99 (citing, *inter alia*, *J. McIntyre Mach., Ltd.v. Nicastro*, 564 U.S. 873, 881 (2011) (stating that under specific jurisdiction, a defendant is subject to suit on causes of action that "arise out of or are connected with the activities within the state")); *Carfagno*, at *5.

a.   Plaintiffs Have Not Pled Specific Jurisdiction Over Defendants

Here, the Complaint is devoid of a single allegation that Plaintiffs' dispute with Defendants has any connection to New Jersey other than the false assertion that (i) Neopharma has a "registered address" in Princeton, New Jersey, and (ii) non-party Neopharma Inc. is a "regional office and formulations facility for Neopharma" and is located at the same Princeton,

New Jersey address.  Compl. ¶4.[6]  And, the Supplier Agreements themselves bear no connection whatsoever to New Jersey.  Indeed, (i) the Supplier Agreements were negotiated by Defendants from their respective offices in the UAE, (ii) the pharmaceutical products identified in the Neopharma/Nexgen invoices were to be sold by Neopharma and Nexgen from their locations in the UAE, to a purchaser in the UAE, for delivery in the UAE, and (iii) payments for the pharmaceutical products, although transacted in U.S. Dollars, were made among foreign banks, at their non-U.S. locations, using a correspondent bank in New York (not New Jersey).  Given the complete absence of allegations tying this dispute to any activities of Defendants in New Jersey, the only proper basis of jurisdiction would be general jurisdiction.  *See Carfagno*, 2005 WL 1523530, at *7 (finding that specific jurisdiction must be rejected where a complaint fails to allege any allegations that a defendant "purposefully directed" its activities at the forum state").

In order to invoke general jurisdiction, a plaintiff must plead that a defendant has a sufficient "physical presence" to establish that it is "at home" in the forum.  *Dutch Run*, 450 N.J. Super. at 600.  Ordinarily, this requires that the defendant-entity was formed under the laws of the forum or maintains its principal place of business in the forum.  *Id*. (citing, *inter alia*, Goodyear, 564 U.S. at 924).  Indeed, even where an entity is registered to do business and accept service in the forum, that alone is insufficient to establish general personal jurisdiction over the entity.  *Id.* at 606.

b.   Defendants are Not Subject to General Jurisdiction Through Their Business Associations

Where a court's lack of personal jurisdiction is raised by a defendant, the burden is on the plaintiff to show that the defendant has "purposefully availed itself of the privilege of conducting

---

[6]  With respect to Nexgen, the only allegation that feebly attempts to connect Nexgen to New Jersey is that Neopharma "owns 50% of Nexgen."  Compl. ¶5.

activities within the forum State, thus invoking the benefits and protections of its laws." *Carfagno*, 2005 WL 1523530, at \*5 (citing *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  And, it is well-settled that a "plaintiff may not rely on the pleadings alone in order to withstand a motion to dismiss for lack of personal jurisdiction."  *Id.* (citing *Stranahan Gear Co., Inc. v. NL Indus.*, 800 F.2d 53, 58 (3d Cir. 1986), and *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984)).  "Therefore, the plaintiff must come forward with facts sufficient to establish by a preponderance of the evidence that the district court has personal jurisdiction over the defendant."  *Id.* (citing *Time Share Vacation Club*, 735 F.2dat 65, *IMO Indus.*, 155 F.3d at 257 ("the plaintiff bears the burden of proving that personal jurisdiction is proper"), and *Gehling v. St. George's Sch. of Med.*, 773 F.2d 539, 542 (3d Cir.1985) ("[P]laintiff bears the burden of establishing with reasonable particularity sufficient contacts between the defendant and the forum state to support jurisdiction.")).

Here, the Complaint implies that Neopharma is subject to general jurisdiction in New Jersey through its purported subsidiary's (Neopharma, Inc.) presence in New Jersey.  The Complaint also purports to suggest that Nexgen is also subject to New Jersey jurisdiction because it is owned by Neopharma.  *See* Complaint ¶¶ 4-5.

However, the Complaint pleads no actual jurisdictional allegations whatsoever.  For this reason alone, the Complaint must be dismissed.  Notwithstanding the Complaint's facial deficiencies, however, even if appropriate allegations were made, neither Neopharma nor Nexgen are subject to personal jurisdiction in New Jersey through their purported, but non-existent corporate associations.[7]

---

[7]  As noted above and as set forth in the Shetty Declaration (¶¶9-11), Neopharma Inc. is not (and at all relevant times was not) a subsidiary of defendant Neopharma LLC.  But, strictly for

It is well-settled that the forum contacts of a corporate subsidiary will not be imputed to its parent entity without a showing of something more than corporate ownership. *Pfundstein v. Omnicom Grp. Inc.*, 285 N.J. Super. 245, 252 (1995) (citing, *inter alia*, *Lucas v. Gulf & W. Indus., Inc.*, 666 F.2d 800 (3d Cir. 1981)).  The reverse is true as well, *i.e.*, a court will not impute personal jurisdiction over an entity to its subsidiary without "something more than mere ownership." *Naty Samra v. Rehrig Pacific Co.*, 2018 WL 2049269 (D.N.J. April 16, 2018).  In this Circuit, in order for a court to impute its jurisdiction over one corporate entity to another, plaintiff must establish that the "subsidiary was merely the alter ego or agent of the parent, and whether the independence of the separate corporate entities was disregarded." *Seltzer v. I.C. Optics, Ltd.*, 339 F. Supp. 2d 601, 609 (D.N.J. 2004).  Moreover, "a court will impute personal jurisdiction over a foreign subsidiary corporation only where the plaintiff shows: (1) the subsidiary was dominated by the parent corporation, and (2) adherence to the fiction of separate corporate existence would perpetrate a fraud or injustice, or otherwise circumvent the law." *Naty Samra*, 2018 WL 2049269, at *2.

In order to meet the first part of this "alter ego standard," a plaintiff must establish that "the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent." *Id.* (citing *Verni ex rel. Burstein v. Harry M. Stevens, Inc.*, 387 N.J. Super. 160, 200 (2006) (quoting *State, Dep't of Envtl. Prot. v. Ventron Corp.*, 94 N.J. 473, 501 (1983)).  In determining whether such "corporate dominance" exists, the court must engage "in a fact-specific inquiry" to analyze, *inter alia*, whether the subsidiary was operated not by its own personnel, but that of the parent's directors, officers and employees, and whether the subsidiary failed to observe proper corporate formalities, lacks corporate records, and is merely a corporate

---

purposes of this argument, Defendants will presume the truth of Plaintiffs' allegation that Neopharma LLC is the "100% owner of Neopharma Inc." (Compl. ¶4).

façade for the parent entity.  *Id.*  A court will also consider "common ownership, financial dependency, interference with a subsidiary's selection of personnel, and control over a subsidiary's marketing and operating policies."  *Id.* (*citing FDASmart, Inc. v. Dishman Pharm. & Chemicals Ltd.*, 448 N.J. Super. 195, 204 (2016)).

With respect to the second alter ego prong, a plaintiff must prove "the parent abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law."  *Id.* (citing *Shotmeyer v. N.J. Realty Title Ins. Co.*, 195 N.J. 72, 86–87 (2008)).  Thus, "where individuals set up legitimate business structures to further their personal and business plans and do not use their partnerships to commit fraud or defeat the ends of justice, the veil-piercing alter ego doctrine will not apply."  *Id.* (citing *FDASmart, Inc.*, 448 N.J. Super. at 205).

As explained in the Shetty Declaration, Neopharma Inc. is not owned by and therefore is not a subsidiary of defendant Neopharma LLC.  *See* Shetty Decl. at ¶¶ 9-12. In addition, the Complaint itself is devoid of a single allegation that Neopharma Inc. is a mere façade of its corporate parent.  The Complaint also fails to connect the operations of Neopharma or Nexgen to New Jersey and, as such, personal jurisdiction over Neopharma and Nexgen cannot be invoked by this Court.

## PLAINTIFFS' COMPLAINT FAILS TO STATE A CLAIM AS A MATTER OF LAW

### C.    Plaintiffs Fail to State a Civil RICO Claim

"The RICO statute provides for civil damages for 'any person injured in his business or property by reason of a violation of 18 U.S.C. § 1962.'"  *Miller v. Burt*, 765 F. App'x 834, 838 (3d Cir. 2019) (quoting *Tabas v. Tabas*, 47 F.3d 1280, 1289 (3d Cir. 1995)).  "Careful scrutiny of [RICO] claims is appropriate because of the 'relative ease with which a plaintiff may mold a

RICO pattern from allegations that, upon closer scrutiny, do not support it.'" *Absolute Power Sys., Inc. v. Cummins, Inc.*, 2016 WL 6897782, at \*4 (D.N.J. Nov. 23, 2016) (quoting *Kolar v. Preferred Real Estate Invs., Inc.*, 361 F. App'x 354, 363 (3d Cir. 2010)). "Moreover, courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Id.* (quotations and citation omitted).

Plaintiffs' RICO claim fails to satisfy RICO's demanding pleading requirements. Therefore, Plaintiffs' RICO claim should be dismissed.

a.   <u>Plaintiffs' RICO Claim is Impermissibly Extraterritorial</u>

As a preliminary matter, the Court need not reach the merits of whether the Complaint satisfies the elements of a RICO claim because Plaintiffs' RICO allegations plead neither domestic injury nor predicate acts implicating interstate or foreign commerce. Thus, the Complaint's RICO claim fails on either ground as being impermissibly extraterritorial and should be dismissed based on this threshold issue.

i.   <u>Plaintiffs Fail to Allege Domestic Injury</u>

The U.S. Supreme Court has held that "18 U.S.C. § 1964(c) does not allow recovery for injuries suffered in foreign territories. The Court explained that "nothing in § 1964(c) provides a clear indication that Congress intended to create a private right of action for injuries suffered outside of the United States. Thus, although RICO creates a cause of action for misconduct committed abroad, § 1964(c) requires a 'domestic injury." *Humphrey v. GlaxoSmithKline PLC*, 905 F.3d 694, 700 (3d Cir. 2018) (quoting *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016)).

Here, Plaintiffs are companies incorporated and having registered offices in the Cayman Islands. Compl. ¶¶2-3. The Supplier Agreements reaffirm that Plaintiffs' address is in the

Cayman Islands, while Neopharma and Nexgen's respective addresses are in the UAE.  Compl., Ex. 2 at p. 1, Ex. 3 at p. 1.  Plaintiffs' damages allegedly arise from a failure to repay monies that were advanced out of Plaintiffs' bank account in London.  *Id*. ¶129.  Plaintiffs do not allege that they have any presence whatsoever in the United States.  As such, Plaintiffs do not and cannot allege domestic injury.  Plaintiffs' RICO claim therefore fails as a matter of law.  *See Humphrey*, 905 F.3d at 711 (affirming dismissal of RICO claim where plaintiffs failed to establish domestic injury).

ii.    Plaintiffs Fail to Allege Use of Wires in Interstate or Foreign Commerce

Although the RICO statute does not require that racketeering activity take place exclusively and solely in the U.S., allegations of racketeering activity based on wire fraud must nevertheless be anchored to the U.S., either through interstate commerce or foreign commerce. "[A] RICO enterprise must engage in, or affect in some significant way, commerce directly involving the United States—*e.g.*, commerce between the United States and a foreign country. Enterprises whose activities lack that anchor to U.S. commerce cannot sustain a RICO violation." *RJR Nabisco*, 136 S. Ct. at 2105; *see also Kaul v. Christie*, 372 F. Supp. 3d 206, 248 (D.N.J. 2019) (stating that "use of the wires must be interstate" for RICO claim predicated on wire fraud).

Plaintiffs' RICO claim is premised on Defendants' alleged use of the wires "for the purpose of executing" a "scheme and artifice."  Compl. ¶128.  However, Defendants' only relevant uses of the wires alleged by Plaintiffs are the emails sent by Defendants' designated representatives on March 15, 2020 "denying that Neopharma Invoice 6334 and Nexgen Invoices 7795 and 7924 were Neopharma's and Nexgen's respective invoices."  *Id*.  These uses of the wires, however, do not implicate either interstate commerce or foreign commerce.  As noted,

Plaintiffs are based in the Cayman Islands, and Defendants are based in the UAE.  *Id*. ¶¶2-5. The designated representatives who sent the emails of March 15, 2020 (Vivek Bhatt on behalf of Neopharma and Siby Mathew on behalf of Nexgen), at all relevant times, resided and worked outside of the United States.  The March 15, 2020 emails were sent to Plaintiffs' employees whose signature blocks show addresses in London.  *See* Compl., Exs. 40 and 41.

In short, the Complaint does not identify a single email or other wire communication that was sent by Defendants to, from, or within the U.S. in furtherance of Defendants' alleged scheme.  To the contrary, the Complaint alleges that the Defendants' racketeering activities involved use of wires exclusively in foreign jurisdictions.  A RICO claim alleging exclusively foreign racketeering activity, with no alleged anchor to the U.S., fails as a matter law.  *See RJR Nabisco*, 136 S. Ct., at 2105; *Kaul*, 372 F. Supp. 3d, at 248.

Plaintiffs' RICO claim should therefore be dismissed on this basis as well.

b.     Plaintiffs Fail to Plead a Violation of Section 1962(c)

"To establish a RICO claim, a plaintiff must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Gratz v. Ruggiero*, 822 F. App'x 78, 80-81 (3d Cir. 2020) (quoting *Sedima, S.P.R.L v. Imrex Co.*, 473 U.S. 479, 496 (1985)).  The Complaint fails to adequately plead any of these elements.

i.     Plaintiffs Fail to Allege the Existence of an Enterprise

The RICO statute defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  "A RICO enterprise is 'an entity [made up of] a group of persons associated together for the common purpose of engaging in a course of conduct.'"  *Smart v. Winslow*, 2015 WL 5455643, at *8 (D.N.J. Sept. 16, 2015) (quoting *District*

*1199P Health and Welfare Plan v. Janssen L.P.*, 784 F. Supp. 2d 508, 526 (D.N.J. 2011)).  "To establish the existence of an enterprise, a plaintiff must prove that (1) the enterprise is an ongoing organization with some sort of framework or superstructure for making or carrying out decisions; (2) the members of the enterprise function as a continuing unit with established duties; and (3) the enterprise must be separate and apart from the pattern of activity in which it engages."  *Id*. (quoting *District 1199P Health and Welfare Plan*, 784 F. Supp. 2d at 526).  A plaintiff "must also demonstrate that the RICO person 'participate[d] . . . in the conduct of the enterprise's affairs' by showing that the individual participated in the 'operation and management' of the enterprise."  *Tedeschi v. Smith*, 2010 WL 148424, at *3 (D.N.J. Jan. 12, 2010) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993)).

The Complaint's "enterprise" allegation falls woefully short of the required standard. Plaintiffs attempt to allege the existence of a RICO enterprise in a single sentence: that "Defendants' coordinated actions and conspiracy to defraud, as described above, constituted an enterprise."  Compl. ¶127.  As a threshold matter, this allegation obviously treats Defendants' enterprise and their alleged wrongful acts as one and the same.  As such, Plaintiffs fail to allege an enterprise that is "separate and apart from the pattern of activity in which it engages," and the RICO claim should be dismissed for this independent reason.

Plaintiffs' single, conclusory sentence concerning the existence of an enterprise also does not plead the organization or structure of the enterprise, nor does it plead the purpose of the enterprise.  Not only do Plaintiffs fail to describe the enterprise in any way, they also fail to allege each Defendant's participation and role in the conduct of the enterprise's affairs, which is yet another fatal defect in Plaintiffs' RICO claim.  *See Tedeschi*, 2010 WL 148424, at *3 (to satisfy the "'operation and management' test, a plaintiff must demonstrate 'a nexus between the

person and the conduct in the affairs of an enterprise'") (quoting *U.S. v. Parise*, 159 F.3d 790, 796 (3d Cir. 1998)).

Furthermore, alleging, as Plaintiffs do, that the only purpose for the existence of the enterprise was to engage in the predicate acts set forth in the Complaint is insufficient as a matter of law to satisfy the enterprise requirement. *See, e.g., Hollis-Arrington v. PHH Mortg. Corp.*, 2005 WL 3077853, at *8 (D.N.J. Nov. 15, 2005) (plaintiffs failed to allege RICO enterprise where the "specific violations" at issue were "the sole reason for the existence of the Enterprise"), *aff'd*, 205 F. App'x 48 (3d Cir. 2006).

For each of these reasons, the RICO claim should be dismissed.

ii.    Plaintiffs Fail to Allege a Pattern of Racketeering Activity

1.    Predicate Acts

"To establish a pattern of racketeering, a plaintiff must show that each defendant committed at least two predicate acts of racketeering from the list of acts provided in 18 U.S.C. § 1961." *Mineo v. McEachern*, 2014 WL 2197032, at *3 (D.N.J. May 27, 2014). "[N]o defendant can be liable under RICO unless he participated in two or more predicate offenses sufficient to constitute a pattern." *Banks v. Wolk*, 918 F.2d 418, 421 (3d Cir. 1990).

Here, the Complaint pleads only a single purported predicate act by each Defendant.[8] Specifically, Plaintiffs allege that Neopharma committed an act of wire fraud when its designated representative, Mr. Bhatt, sent an email on March 15, 2020, denying that alleged Neopharma Invoice 6334 was an actual Neopharma invoice; and that Nexgen committed an act of wire fraud when its designated representative, Mr. Mathew, sent an email the same day denying that alleged

---

[8]    For the reasons explained below in Sections F, G & H of this Memorandum of Law, the Complaint's fraud-based claims are legally deficient as the Complaint pleads no misrepresentations made by the Defendants that induced any reliance by Plaintiffs to make the payments in respect of the invoices in dispute.

Nexgen Invoices 7795 and 7924 were actual Nexgen invoices.  Compl. ¶¶54, 55, 128.   Each Defendant's commission of only a single predicate act is insufficient, as a matter of law, to constitute a "pattern" of racketeering activity for RICO purposes.  *Banks*, 918 F.2d at 421.

As purported evidence that each Defendant's predicate act was part of a scheme consisting of "coordinated fraudulent acts" (Compl. ¶ 129), Plaintiffs offer nothing more than an allegation that the emails of March 15, 2020, had similar wording and were sent at around the same time.  This allegation is insufficient to establish fraud under the heightened pleading standard of Rule 9(b).  Plaintiffs do not explain how the mere timing of two emails can, on its own, establish an entire plan or scheme to defraud particularly when those emails were sent after the Plaintiffs made their payments in respect of the subject invoices.  Rule 9(b) requires alleging a fraudulent scheme in detail in order to put the defendant on notice of exactly who entered into the scheme and when, what was said in connection with the scheme, and where the relevant events to establish the scheme took place.  *See Bonavitacola Elec. Contr., Inc. v. Boro Developers, Inc.*, 87 F. App'x 227, 231 (3d Cir. 2003) ("The who, what, when and where details of the alleged fraud are required.") (alterations and quotations omitted).  The Complaint contains none of these necessary pleading requirements.

Furthermore, there is nothing in the Complaint that ties Mr. Bhatt and Mr. Mathew's respective emails to a broader, coordinated fraudulent scheme, let alone one that was planned, coordinated, and executed by Defendants.   In the absence of allegations establishing a link between Defendants' acts and the fraudulent scheme, Plaintiffs cannot even satisfy the normal pleading standard of Rule 8.  *See, e.g., Ottilio v. Valley Nat'l Bancorp*, 591 F. App'x 167, 169 (3d Cir. 2015) ("Merely pointing out that a bank employee has accepted bribes, without averring

any facts linking that crime to the alleged RICO violations, falls short of the 'facial plausibility' needed to withstand a motion to dismiss.") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In short, Plaintiffs' claim that Defendants' activities were part of a "coordinated" pattern is simply conclusory, and such conclusory allegations are insufficient to state a RICO claim as a matter of law.

2.      Wire Fraud

"The offense of mail or wire fraud has two essential elements: '(1) a scheme to defraud, and (2) a mailing or wire in furtherance of that scheme.'" *Kaul*, 372 F. Supp. 3d, at 248(quoting *Annulli v. Panikkar*, 200 F.3d 189, 200 n.9 (3d Cir. 1999)). "Allegations of either [mail or wire fraud], as predicates for a civil cause of action, must meet the heightened pleading standard of Rule 9(b)." Id. (citing *Warden v. McLelland*, 288 F.3d 105, 114 (3d Cir. 2002)).

In this case, Plaintiffs' allegation that "Defendants repeatedly used e-mail in violation of the United States criminal wire fraud statute" (Compl. ¶ 128) is the very definition of a conclusory statement. *See, e.g., Miller*, 765 F. App'x, at 838) (plaintiff "failed to adequately plead a pattern of racketeering acts" where complaint "only vaguely suggests that 'a lot of times' fraud is involved with property transactions, and references the 2008 housing bubble as a 'prime example' of this contention"). Stated differently, the Complaint simply does not plead the "fraud" part of "wire fraud."

Plaintiffs fail to allege a scheme to defraud under the level of specificity required by Rule 9(b). Indeed, the Complaint recites boilerplate allegations of "fraud" without identifying the precise fraudulent scheme, much less with the required particularity. Furthermore, Plaintiffs also fail to allege the Defendants' specific role within the fraudulent scheme and how the Defendants' "fraudulent acts" were undertaken in furtherance of the fraudulent scheme.

In fact, the only "fraudulent acts" the Plaintiffs allege the Defendants committed were their denials that Neopharma Invoice 6334 and Nexgen Invoices 7795 and 7924 were legitimate or had been issued by the Defendants.  Notably, the Complaint fails to allege why such email communications by the Defendants were false and why those representations constituted part of the fraudulent scheme, which as explained before is never identified in the Complaint.  In other words, the Complaint fails to plead any allegations concerning the Defendants' participation in the alleged scheme to defraud the Plaintiffs or how their denial of the subject invoices was an integral role in the purported fraudulent scheme.

In fact, the Complaint alleges the very opposite of the existence of a pre-existing fraudulent scheme.  The Complaint alleges that Plaintiffs were paid (by NMC) the amounts owed for all prior invoices.  Plaintiffs thus do not plead how Defendants' alleged illegal use of the wires (i.e., the Defendants' denial of the invoices) is connected to any preexisting fraudulent scheme.  At best, Plaintiffs simply allege that they were not paid (by NMC) in connection with three (3) invoices.  These allegations cannot and do not establish wire fraud at the heightened pleading level required to sustain a RICO claim.

### 3.     The Continuity Requirement

"Proving a pattern of racketeering activity requires plaintiffs to show 'that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity.'"  *Germinaro v. Fid. Nat'l Title Ins. Co.*, 737 F. App'x 96, 102 (3d Cir. 2018) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).  "The requirement that the predicate acts 'amount to or pose a threat of continued criminal activity' is commonly known as the 'continuity' requirement."  *Id.* (quoting *H.J. Inc.*, 492 U.S. at 240).  "Continuity comes in two forms: closed-ended and open-ended."  *Id.*

The Complaint does not identify which form of continuity Plaintiffs purport to rely on. Be that as it may, Plaintiffs fail to allege either form of continuity.

(a)     Closed-Ended Continuity

"Closed-ended continuity refers 'to a closed period of repeated conduct,' and it can be established by 'proving a series of related predicates extending over a substantial period of time.'" *Germinaro*, 737 F. App'x at 102 (quoting *H.J., Inc.*, 492 U.S. at 241-42). "The Third Circuit has held that conduct lasting less than twelve months does not establish closed continuity." *Absolute Power Sys.*, 2016 WL 6897782, at *6 (citing *Tabas*, 47 F.3d at 1293).

In this case, the fraudulent misconduct allegedly began in November 2019, when Plaintiffs were sent alleged Neopharma Invoice 6334, which was followed soon thereafter by alleged Nexgen Invoices 7795 and 7924.  Compl. ¶¶36, 40, 44.   Plaintiffs further assert that Defendants' fraudulent scheme culminated on March 15, 2020, when Defendants' respective designated representatives sent emails disavowing alleged Neopharma Invoice 6334 and alleged Nexgen Invoices 7795 and 7924.  *Id*. ¶¶54-55, 128.  The Complaint does not assert any misconduct by Defendants prior to November 2019; in fact, Plaintiffs specifically state that NMC fully repaid the invoices issued on behalf of Defendants before November 2019.  *See* Compl. ¶¶27, 31, 35.  Nor does the Complaint identify any misconduct by Defendants after March 2020.

Thus, Plaintiffs allege, at best, a scheme that took place over a period of five months—*i.e.*, between November 2019 to March 2020.  Because the alleged scheme lasted for less than twelve months, Plaintiffs cannot establish closed-ended continuity.  *See, e.g., Germinaro*, 737 F. App'x at 102 ("[N]ine-and-a-half-month period of alleged racketeering activity is insufficient as

a matter of law to establish closed-ended continuity because activity covering less than twelve months does not constitute a substantial period of time.").

(b)    Open-Ended Continuity

Open-ended continuity refers "to past conduct that by its nature projects into the future with a threat of repetition, and it can be established by proving a threat of continuity, which exists where the predicate acts themselves involve threats of long-term racketeering activity, or where the predicate acts are part of an entity's regular way of doing business." *Germinaro*, 737 F. App'x 96 at 102 (quotations and citations omitted).

Here, Plaintiffs do not allege that Defendants have engaged or threatened to engage in any misconduct after March 2020, or that Defendants' alleged racketeering activity is part of their regular way of doing business.  Indeed, given that Plaintiffs have commenced this action by filing the Complaint, it is illogical to conclude that Defendants would even be able to "continue" to defraud Plaintiffs.  Because no future criminal conduct by Defendants towards Plaintiffs can be alleged, Plaintiffs are unable to establish open-ended continuity as a matter of law.  *See Absolute Power Sys.*, 2016 WL 6897782, at *6 ("Predicate acts lasting 'a few weeks or months and threatening no future criminal conduct do not satisfy the continuity requirement'") (quoting *H.J. Inc.*, 492 U.S. at 242).

Because Plaintiffs do not and cannot satisfy the continuity requirement, their RICO claim should be dismissed.

c.    <u>Plaintiffs Lack RICO Standing</u>

Even if Plaintiffs sufficiently plead a violation of Section 1962(c) (which they do not), their RICO claim should nevertheless be dismissed for lack of standing.

30

"To have standing to bring a RICO claim, a plaintiff must show (1) that he was injured (2) by reason of a violation of § 1962." *Gratz*, 822 F. App'x at 81. "In other words, 'the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his . . . property by the conduct constituting the violation.'" *Giles v. Phelan, Hallinan & Schmieg, L.L.P.*, 2013 WL 2444036, at *8 (D.N.J. June 4, 2013) (quoting *Sedima*, S.P.R.L, 473 U.S. at 496). "Furthermore, a plaintiff must show that the defendant's RICO violation was not only a 'but for' cause of his injury, but also that it was the proximate cause." *Gratz*, 822 F. App'x at 81. "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Giles*, 2013 WL 2444036, at *8 (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)). "[A] link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *In re Aetna UCR Litig.*, 2015 WL 3970168, at *33 (D.N.J. June 30, 2015) (quoting *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010)).

Here, Plaintiffs allege neither but-for causation nor proximate causation with respect to Defendants' alleged misconduct. The Complaint pleads that the false invoices (*i.e.*, alleged Neopharma Invoice 6334 and alleged Nexgen Invoices 7795 and 7924) were sent to Plaintiffs by NMC, not by Defendants, and Plaintiffs do not allege any facts indicating involvement by Defendants with the delivery of those invoices to Plaintiffs. Compl. ¶¶36, 40, 44. The obligation to repay Plaintiffs for advancing payment on these invoices belonged to NMC, not to Defendants. Compl. ¶15 (alleging that "NMC agreed to be responsible for paying the full amount of the invoices to Plaintiffs at a later date in exchange for Plaintiffs making the payments for NMC's orders from Defendants"). And, indeed, in earlier transactions between the parties, Plaintiffs admit that they were repaid by NMC, not by Defendants. Compl. ¶¶27, 31, 35.

Accordingly, to the extent Plaintiffs assert they were "injured" as a result of the failure to reimburse Plaintiffs for the monies they advanced for alleged Neopharma Invoice 6334 and alleged Nexgen Invoices 7795 and 7924, this injury arose from transactions that were initiated by NMC based on payments obligations that belonged only to NMC.  There is nothing in the Complaint even suggesting that Defendants were either the but-for or proximate cause of Plaintiffs' injury.  *See Anza*, 547 U.S. at 459 (there is no proximate causation if plaintiff's alleged injuries "could have resulted from factors other than [the defendants'] alleged acts of fraud").

Furthermore, while Plaintiffs assert that Defendants committed acts of wire fraud by sending emails disavowing alleged Neopharma Invoice 6334 and alleged Nexgen Invoices 7795 and 7924, Plaintiffs do not explain the connection between this disavowal and Plaintiffs' injury, given that NMC (not Defendants) was responsible for repaying Plaintiffs for those transactions.[9] Because there is no direct link between Defendants' alleged predicate acts and Plaintiffs' injury, Plaintiffs fail to establish proximate cause for purpose of the RICO statute.  *See Giles*, 2013 WL 2444036, at *8 ("The proximate cause requirement 'limit[s] a person's responsibility for the consequences of that person's own acts'") (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)).

d.    Plaintiffs Cannot Allege a RICO Conspiracy

As previously mentioned, Plaintiffs do not identify the paragraph of 18 U.S.C. § 1962 upon which their Complaint is premised.  To the extent Plaintiffs purport to assert a RICO conspiracy claim under Section 1962(d), this claim nevertheless fails because, for the reasons set

---

[9]    Moreover, the Complaint fails to allege any misrepresentation made by the Defendants to the Plaintiffs that induced reliance by the Plaintiffs and resulted in the Plaintiffs making the advance payments that NMC has now allegedly refused to repay.

forth above, Plaintiffs do not and cannot allege a substantive violation of Section 1962(c).  *See*

*N.V.E., Inc. v. Palmeroni*, 2015 WL 13649814, at *8 (D.N.J. Feb. 23, 2015) ("Because the Court

finds that [plaintiff] fails to plead a substantive violation of RICO under § 1962(c), its conspiracy

claim under § 1962(d) necessarily fails.") (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d

1153, 1191 (3d Cir. 1993)).

**D.**     **Plaintiffs Fail to State a Breach of Contract Claim**

To state a claim for breach of contract, a plaintiff "must allege (1) a contract between the

parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party

stating the claim performed its own contractual obligations."  *Frederico v. Home Depot*, 507

F.3d 188, 203 (3d Cir. 2007).  In this case, the Complaint fails to sufficiently plead the elements

of breach and damages resulting from such breach.

The Complaint alleges that Defendants breached Section 4.1.2 of Defendants' respective

Supplier Agreements.  The text of Section 4.1.2 is the same in both the Neopharma Supplier

Agreement and the Nexgen Supplier Agreement.  In Section 4.1.2 of each agreement, each

Defendant represented and warranted that "this Agreement has been entered into on arm's length

commercial terms."  Compl., Ex. 2 at p. 3, Ex. 3 at p. 3.  By its plain terms, Section 4.1.2 sets

forth no contractual obligation by Defendants relating to the alleged invoices and payment

obligations that are the subject of the Complaint.

In particular, Section 4.1.2 has nothing to do with alleged Neopharma Invoice 6334 and

Nexgen Invoices 7795 and 7924; as stated in the Complaint, those alleged invoices were sent to

Plaintiffs by NMC pursuant to the Customer Agreement.  *See* Compl. ¶¶ 36, 40, 44.  And Section

4.1.2 has nothing to do with repayment of any amounts advanced by Plaintiffs for these alleged

invoices; as stated in the Complaint, the repayment obligation belonged to NMC under the terms of the Customer Agreement.  *See* Compl. ¶¶ 15, 37, 41, 45.

In short, Plaintiffs do not identify any "performance" owed by Defendants under the Supplier Agreements in connection with the issuance or repayment of alleged Neopharma Invoice 6334 and Nexgen Invoices 7795 and 7924.  Section 4.1.2 is simply a red herring used by Plaintiffs to distract from the fact that the relevant performance at issue in this case belonged to NMC, not Defendants.  Because Plaintiffs have not, and cannot, identify any relevant provision of the Supplier Agreements that has been breached by Defendants, the Complaint's breach of contract claim fails.  *See, e.g.*, *Mid-Am. Salt, LLC v. Morris Cty. Coop. Pricing Council*, 2018 WL 999675, at *3 (D.N.J. Feb. 20, 2018) (dismissing breach of contract claim where plaintiff failed to allege "a single fact indicating that [defendant] breached its obligations under the Contract," since defendant had "no responsibility under the Contract to make purchases" as claimed by plaintiff).

Even if Plaintiffs sufficiently alleged a relevant breach of the Supplier Agreements by Defendants (which Plaintiffs do not), the Complaint fails to plead that the damages allegedly suffered by Plaintiffs resulted from Defendants' breach.  As noted, alleged Neopharma Invoice 6334 and Nexgen Invoices 7795 and 7924 were sent to Plaintiffs by NMC, and NMC was responsible for repaying the amounts advanced by Plaintiffs on these invoices.  Plaintiffs and NMC had their own, separate agreement governed by its own, separate terms, and Plaintiffs cannot shift the blame to Defendants just because NMC allegedly failed to abide by its contractual obligations.  Because Plaintiffs do not, and cannot, allege that they were damaged by Defendants' breach of the Supplier Agreements, the breach of contract claim fails.  *See, e.g.*, *Mathew v. Specializing Loan Servs.*, 2018 WL 6696776, at *2 (D.N.J. Dec. 20, 2018)

(dismissing breach of contract claim where plaintiff "failed to plead he suffered any damages as a result of the [alleged] breach"), citing *Saba v. Am. Family Life Assurance Co. of Columbus*, 2017 WL 3169056, at \*3 (D.N.J. July 26, 2017) (rejecting a breach of contract claim when plaintiff failed to allege he was denied a benefit or "paid a higher premium" as a result of the breach).

Plaintiffs herein are sophisticated businesses who entered into separate agreements with Defendants on the one hand, and with NMC on the other hand. Plaintiffs cannot ask this Court to alter the agreements by making Defendants liable for payments that only NMC was contractually responsible for making. *See Mid-Am. Salt, LLC*, 2018 WL 999675, at \*3 (where plaintiff was a "sophisticated business entity" that "took a calculated risk by entering into a contract with" defendant, the court "cannot rewrite the bargain Plaintiff made in order to create a more palatable outcome").

Accordingly, Plaintiffs' breach of contract claims (the Complaint's Seventh and Eighth Claims for Relief) should be dismissed.

**E.      Plaintiffs Fail to State a Breach of Covenant of Good Faith and Fair Dealing Claim**

"[E]very contract in New Jersey contains an implied covenant of good faith and fair dealing." *Mid-Am. Salt, LLC*, 2018 WL 999675, at \*4 (quoting *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997)). "Breach of the implied covenant occurs where a party acts with ill motives to destroy the reasonable expectations of another contracting party." *Ricketti v. Barry*, 2015 WL 1013547, at \*7 (D.N.J. Mar. 9, 2015). To allege breach of the implied covenant, plaintiffs "must plead facts that would show that [d]efendants acted in bad faith by performing actions that, while 'consistent with the contract's literal terms, were done in bad faith, with the effect of destroying or injuring the right of the other party to receive the fruits of

the contract.'"   *Cedar Holdings, LLC v. Menashe*, 2017 WL 1349321, at *3 (D.N.J. Apr. 7,

2017) (quoting *Wade v. Kessler Inst.*, 172 N.J. 327, 345 (2002)).   "However, a plaintiff may not

pursue a claim for a breach of the implied covenant of good faith and fair dealing if the claim is

duplicative of the plaintiff's breach of contract claim.   A claim for breach of the implied

covenant is duplicative of a breach of contract claim when allegations of bad faith all relate to

actions that form the basis of the breach of contract claim." *Id.* (citations omitted).

Here, Plaintiffs' allegations in their breach of implied covenant claim all relate to actions

that form the basis of the Plaintiffs' breach of contract claim.   Specifically, Plaintiffs allege that

Defendants breached the implied covenant by using alleged false invoices and delivery notes to

"trick" Plaintiffs into paying for "goods that were never delivered in accordance with the

Customer Agreement and" Supplier Agreements.   Compl. ¶¶ 145, 150.   There is thus no material

difference between Plaintiffs' breach of implied covenant claim and breach of contract claim: in

both, Plaintiffs allege that Defendants (and NMC) failed to perform their contractual obligations

under the parties' agreements.   As such, the breach of implied covenant claim is duplicative of

the breach of contract claim, and Plaintiffs' wholly conclusory allegation that Defendants "acted

in bad faith or with malicious motive" does not change this conclusion.   *See, e.g.*, *Cedar*

*Holdings, LLC*, 2017 WL 1349321, at *3 (dismissing breach of implied covenant claim as

duplicative of breach of contract claim where plaintiff alleged that defendants "breached the

literal terms" of the parties' agreement); *Ricketti*, 2015 WL 1013547, at *8 (dismissing breach of

implied covenant claim where plaintiff "has not identified any allegedly unlawful conduct of

Defendants that is distinct from a potential contract breach").

In any event, Plaintiffs' allegation that Defendants acted in bad faith is insufficient not

only because it is conclusory, but also because it is illogical and deficient on its face.   According

to the Complaint, the obligation to repay Plaintiffs for advancing payment on invoices belonged to NMC, not to Defendants.  The Complaint does not explain how Defendants could have acted with bad faith or malicious motive when the alleged wrongful acts in this case—sending alleged Neopharma Invoice 6334 and Nexgen Invoices 7795 and 7924 to Plaintiffs and then failing to repay Plaintiffs for advancing payment on these invoices—were performed by NMC and had to do only with NMC's obligations under the Customer Agreement.  Thus, the breach of implied covenant claim should be dismissed on this separate ground.  *See, e.g.*, *GKE Enters., LLC v. Ford Motor Credit Co. LLC USA*, 2010 WL 2179094, at *4 (D.N.J. May 26, 2010) (breach of implied covenant claim dismissed where "complaint fail[ed] to allege why under the facts specific to this case early termination of the contract was in bad faith").

Plaintiffs cannot use the breach of implied covenant claim as a backdoor attempt to duplicate and repackage their other contract-based claims.  Plaintiffs' breach of implied covenant claims (the Complaint's Ninth and Tenth Claims for Relief) should be dismissed in their entirety.

## F.  Plaintiffs Fail to State a Claim for Fraudulent Misrepresentation

To allege fraudulent misrepresentation, "a plaintiff must establish five elements: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 602 (D.N.J. 2016) (citation omitted).  "These factors must be pleaded with particularity under Rule 9(b) to place the defendant on notice of the precise misconduct with which it is charged." *Id*.

On its face, Plaintiffs' Complaint fails to plead the required elements for fraudulent misrepresentation.  First, the only communication that Defendants are alleged to have had with

Plaintiffs are Mr. Bhatt (on behalf of Neopharma) and Mr. Mathew's (on behalf of Nexgen) respective emails of March 15, 2020 denying that alleged Neopharma Invoice 6334 and alleged Nexgen Invoices 7795 and 7924 were Defendants' invoices.  The emails of March 15, 2020, were sent after Plaintiffs had already advanced payment on these invoices.  However, like all the other invoices mentioned in the Complaint that were exchanged between the parties, the disputed invoices were sent to Plaintiffs by NMC, not by Defendants.   Even assuming Defendants allegedly "created" the invoices, which they did not, the invoices make no mention of Plaintiffs or indicate the Defendants "sent" these invoices to Plaintiffs.  *See* Compl., Exs. 21, 26, 31. Furthermore, the Complaint does not allege any misrepresentation made by Defendants that preceded Plaintiffs' advancing of payment on the invoices.  The fraud claim thus fails as a matter of law.  *See, e.g., Stockroom, Inc. v. Dydacomp Dev. Corp.*, 941 F. Supp. 2d 537, 546 (D.N.J. 2013) ([P]laintiff "[did] not satisfy the first and most basic element of common law fraud—a statement of material fact that is false" where allegation that "system malfunctioned by issuing faulty authorization codes is an alleged fact; it is not a material misrepresentation of a fact.").

Second, even if Defendants are somehow deemed to have made any relevant representations to Plaintiffs, there are no facts alleged in the Complaint that such representations were made by Defendants with knowledge of falsity, and that Defendants intended for Plaintiffs to rely on the representations to Plaintiffs' detriment.  Although the Complaint baldly pleads that alleged Neopharma Invoice 6334 and alleged Nexgen Invoices 7795 and 7924 were "false" and that Defendants "intended" for Plaintiffs to rely on the invoices (Compl. ¶¶65, 67, 79, 81), these allegations are entirely conclusory and therefore insufficient under Rule 9(b).  Likewise, given that the invoices were sent to Plaintiffs by NMC, the Complaint does not explain Plaintiffs' purported "reliance" on any statements made by Defendants in connection with the invoices.

The fraud claim thus fails on this basis as well.  *See, e.g., Neuss v. Rubi Rose, LLC*, 2017 WL 2367056, at \*9 (D.N.J. May 31, 2017) (dismissing fraud claim where plaintiff "fail[ed] to allege any facts in support of Defendants' knowledge or belief of their falsity, or that Defendants intended Plaintiffs to rely on that falsity").

Third, because Plaintiffs do not plead any representations by Defendants that allegedly induced reliance by Plaintiffs, the Complaint fails to allege that any injury sustained by Plaintiffs as a result of such reliance was caused by Defendants.  *See, e.g., Torsiello v. Strobeck*, 955 F. Supp. 2d 300, 316 (D.N.J. 2013) (dismissing fraud claim where plaintiff did not "offer[] anything other than conclusory allegations as to reasonable reliance or damages.").

For each these reasons, Plaintiffs' fraudulent misrepresentation claim should be dismissed.

**G.      Plaintiffs Fail to State a Claim for Negligent Misrepresentation**

"[N]egligent misrepresentation requires proof that an incorrect statement was negligently made and justifiably relied upon and that the injury was sustained as a consequence of that reliance."  *Bergen Beverage Distribs. LLC v. E. Distribs. I, Inc.*, 2017 WL 5714702, at \*3 (D.N.J. Nov. 28, 2017) (quotations omitted).  "While an act of omission may constitute a viable negligent misrepresentation claim, a plaintiff may not bring such a claim unless the breaching party owes an independent duty imposed by law."  *Argabright*, at 603-04 (quotations and citations omitted).  Stated differently, "[t]he common law tort of negligent misrepresentation shares all the components of fraud, but includes one additional factor: the misrepresentation must be made by a person with a duty to the plaintiff."  *Torsiello*, 955 F. Supp. 2d at 316.  When, as here, a plaintiff's "claim for negligent misrepresentation sounds in fraud, it must meet the heightened pleading requirement of Rule 9(b)."  *Sani-Pure Food Labs., LLC v. bioMerieux, Inc.*,

2014 WL 6386803, at *5 (D.N.J. Nov. 13, 2014) (citing *In re Suprema Specialties, Inc.*, 438 F.3d 256, 270 (3d Cir. 2006)).

Plaintiffs' negligent misrepresentation claim fails for the same reasons set forth above with respect to the fraudulent misrepresentation claim.   In addition, the negligent misrepresentation claim fails for the separate reason that the Complaint fails to plead the existence of a legal duty owed by Defendants to Plaintiffs.   Plaintiffs' failure to plead the existence of a duty is not surprising given that Neopharma and Nexgen's respective Supplier Agreements specifically state that the agreements do not create a fiduciary or any other special relationship between the parties.   *See* Compl., Ex. 2 at ¶8; Id., Ex. 3 at ¶8.

Furthermore, once Plaintiffs advanced payment to Defendants under the Supplier Agreements, NMC (not Defendants) became a debtor and Plaintiffs became a creditor.   Even if NMC's debt can be attributed to Defendants, "creditor-debtor relationships 'rarely are found to give rise to a fiduciary duty.'"  *Wilkins v. ING Bank FSB*, 2011 WL 3913120, at *2 (D.N.J. Sept. 1, 2011) (quoting *Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47, 53 (3d Cir. 1988)). Rather, where, as here, the parties merely have an arm's-length contractual relationship, a legal duty will not be implied for purposes of a negligence claim.  *See, e.g., Argabright*, 201 F. Supp. 3d at 604 (stating that "[c]ourts in this district have not hesitated to dismiss negligent misrepresentation claims by a purchaser against a manufacturer, absent allegations showing a special relationship" where "[n]othing in the Complaint suggests the existence of an implied fiduciary duty").

Accordingly, Plaintiffs' negligent misrepresentation claim should be dismissed.

## H.     Plaintiffs Fail to State a Conspiracy to Defraud Claim

"[C]ivil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Wiatt v. Winston & Strawn LLP*, 838 F. Supp. 2d 296, 317 (D.N.J. 2012) (quotations omitted).  "In order to survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a civil conspiracy claim must allege at least some facts which could, if proven, permit a reasonable inference of a conspiracy to be drawn.  Plaintiffs can meet this requirement when their complaint sets forth a valid legal theory and it adequately states the conduct, time, place, and persons responsible." *Id.* (citations and quotations omitted).  The heightened pleading standard of Rule 9(b) "applies to claims of conspiracy to defraud." *Bergen Beverage Distributors LLC*, 2017 WL 5714702, at *2.

The Complaint's Fifth Claim for Relief, which alleges a civil conspiracy to defraud, should be dismissed on multiple grounds.  As a preliminary matter, "[i]f there is no valid underlying tort, a claim for civil conspiracy should be dismissed." *Giercyk v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2015 WL 7871165, at *8 (D.N.J. Dec. 4, 2015).  As demonstrated in this memorandum of law, the Complaint fails to state a claim for relief with regard to any of Plaintiffs' underlying tort claims.  Plaintiffs' civil conspiracy claim thus fails as a matter of law.

In addition, the Complaint fails to allege the existence of an agreement to inflict a wrong against Plaintiffs.  Plaintiffs' allegations that Neopharma, Nexgen, and NMC were "acting in concert" by using "false invoices and delivery notes" for the "joint purpose of unlawfully defrauding Plaintiffs" simply parrots the elements of a civil conspiracy claim (Compl. ¶¶ 121-122), and are impermissibly conclusory.  The Complaint does not describe the "conduct, time,

place, and persons responsible" for entering into an alleged agreement to defraud Plaintiffs. *See Wiatt*, 838 F. Supp. 2d at 317 ("In stating a conspiracy claim, a plaintiff must allege facts regarding defendants' joint action rather than making conclusory allegations of concerted action"). On this separate ground, the conspiracy claim should be dismissed. *See, e.g.*, *Swift v. Pandey*, 2013 WL 6054853, at *12 (D.N.J. Nov. 13, 2013) (conspiracy claim dismissed where complaint "contain[ed] only a recitation of the elements of a conspiracy-related claim without reference to any supporting facts which would allow the Court to draw the reasonable inference that each of the Defendants in this action specifically engaged in the underlying unlawful acts by virtue of *an agreement") (emphasis in original).*

Plaintiffs' alleged "[e]vidence of Neopharma and Nexgen's coordination" (Compl. ¶ 123) is equally conclusory and speculative. First, other than the reference to the emails sent by Neopharma and Nexgen's representatives concerning alleged Neopharma Invoice 6334 and Nexgen Invoices 7795 and 7924, none of the other alleged facts cited by Plaintiffs have any relevance to the unpaid transactions that are the subject of the Complaint, or to any alleged agreement between Neopharma, Nexgen, and NMC to defraud Plaintiffs. Specifically, the Complaint contains no allegations connecting non-parties Dr. B.R. Shetty, Mr. Khaleefa Butti Omair Yousif Ahmed Al Muhairi, Hetero Group of India, or NMC Health plc to an alleged conspiracy, nor does the Complaint connect NMC Health plc's bankruptcy in the United Kingdom to an alleged agreement to defraud Plaintiffs. These allegations do not present a plausible basis — let alone one sufficient to satisfy Rule 9(b) — from which the Court can infer the existence of an agreement to defraud Plaintiffs that specifically involved Defendants. *See, e.g.*, *Hart v. Elect. Arts, Inc.*, 740 F. Supp. 2d 658, 671 (D.N.J. 2010) (conspiracy claim

dismissed where plaintiff failed to allege existence of non-conclusory conspiratorial agreement between defendant and non-parties).

Furthermore, to the extent Plaintiffs allege that Defendants and NMC were all mere agents controlled by the same owners, such an allegation defeats Plaintiffs' conspiracy claim. *See Spitz v. Medco Health Sols., Inc.*, 2010 WL 4615233, at *4 (D.N.J. Nov. 3, 2010) ("Without a showing or allegation that the parties each 'acted for their sole personal benefit,' the fact that they were agents or employees of one another as alleged in Plaintiff's complaint makes the count of civil conspiracy impossible to maintain") (quoting *Heffernan v. Hunter*, 189 F.3d 405, 412 (3d Cir. 1999)).

The same conclusion applies to the emails sent by Neopharma and Nexgen's representatives on March 15, 2020. The emails merely state that certain alleged invoices were not Defendants' respective invoices. These emails make no mention of NMC or other non-parties, and Plaintiffs do not allege in the Complaint that NMC or other non-parties had anything to do with these emails. Therefore, the emails of March 15, 2020 do nothing to support the existence of an alleged agreement to defraud entered into by Defendants in concert with NMC or anyone else.

Moreover, Plaintiffs' conspiracy claim is illogical given Plaintiffs' allegations that they entered into separate agreements with Defendants and with NMC. The Complaint pleads that NMC, not Defendants, was "responsible for paying the full amount of the invoices to Plaintiffs." Compl. ¶ 15. As such, it would defy logic for Defendants to enter into an illicit agreement to defraud Plaintiffs out of money that Defendants were never required to pay in the first place. Even if NMC, rather than Defendants, benefitted from avoiding its payment obligation to Plaintiffs, NMC is not named as a defendant in this case; Plaintiffs appear to have made the

strategic decision of pursuing only Defendants because Plaintiffs would face collectability issues with NMC due to the U.K. bankruptcy of NMC's parent company, NMC Health plc.  Be that as it may, because Plaintiffs fail to allege the way in which Defendants would allegedly benefit from an agreement to defraud Plaintiffs, the conspiracy claim fails as a matter of law.  *See Spitz*, 2010 WL 4615233, at \*4 ("In the instant case the Court finds no well-pled allegation that explains with any level of particularity how the alleged conspiracy was hatched or organized, or even to whose benefit it enured").

For each of these reasons, the civil conspiracy claim should be dismissed.

## I.     Plaintiffs Fail to State a Claim for Conversion

"Conversion under New Jersey law is essentially 'the wrongful exercise of dominion and control over the property of another in a manner inconsistent with the other person's rights in that property.'"  *Heriveaux v. Durkin & Durkin LLC*, 2020 WL 487290, at \*8 (D.N.J. Jan. 30, 2020) (quoting *Peloro v. U.S.*, 488 F.3d 163, 173-74 (3d Cir. 2007)).  "To state a claim for conversion, a plaintiff must show: (1) wrongful exercise of dominion or control over the property of another; (2) the taking of the property without authorization; and (3) that the taking was to the exclusion of the owner's rights to that property."  *W.H.P.M., Inc. v. Immunostics, Inc.*, 2020 WL 359146, at \*5 (D.N.J. Jan. 22, 2020).  "When money, as opposed to tangible property, is the subject of a conversion claim, New Jersey courts require that a plaintiff show something more than a contractual obligation on the part of a defendant to pay the plaintiff to establish conversion.  The plaintiff must show that the money in question was identifiably the plaintiff's property or that the defendant was obligated to segregate such money for the plaintiff's benefit."  *Scholes Elec. & Commc'ns, Inc. v. Fraser*, 2006 WL 1644920, at \*5 (D.N.J. June 14, 2006) (internal citation omitted).  Moreover, "in New Jersey, a conversion claim will not lie in the

context of a mere debt." *Gordon v. Nice Sys., Inc.*, 2020 WL 2316278, at *4 (D.N.J. May 11, 2020) (quotation and citation omitted).

Here, Plaintiffs' conversion claim fails as a matter of law on either of two grounds.  First, Plaintiffs' conversion claim arises exclusively from the contractual obligations contained in Plaintiffs' agreements with Defendants and NMC, and the converted funds Plaintiffs seek to recover are the same as the funds allegedly owed under those agreements.  *See* Compl. ¶¶164-166, 171-173 (alleging Defendants "did not deliver the goods" described in the invoices and "did not perform the work" for which they were paid by Plaintiffs).  "Where, as here, the relationship of the parties is governed by contract, there is no viable cause of action for conversion."  *Giercyk v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2015 WL 7871165, at *8 (D.N.J. Dec. 4, 2015).  Plaintiffs' conversion claim thus fails.  *See, e.g., Gordon*, 2020 WL 2316278, at *5 (conversion claim dismissed where it was "simply a restatement of Plaintiff's claim for money owed pursuant to the contract at issue"); *Fagan v. Fischer*, 2019 WL 5587286, at *18 (D.N.J. Oct. 30, 2019) (holding that conversion claim failed as a matter of law where the "relationship between the parties is governed purely by contract" and the case was "not an instance where Defendants exercised unauthorized dominion over the property of another").

Second, the conversion claim fails because Plaintiffs do not and cannot plead that the allegedly converted funds were specifically identifiable as Plaintiffs' property or that Defendants were obligated to segregate such funds for Plaintiffs' benefit.  Nothing in the Supplier Agreements suggests that Plaintiffs retained a property interest in the funds used to pay Defendants, or that Defendants, upon receipt of the funds, were required to segregate the funds for Plaintiffs' benefit.  As such, these funds are not properly the subject of a conversion claim.  *See, e.g., Scholes Elec. & Commc'ns*, 2006 WL 1644920, at *6 ("[F]unds at issue were not

sufficiently segregated or identifiable to be considered Plaintiff's property" where contract did not require recipient of funds to "place such funds in trust for Plaintiff, establish a blocked or escrow account to benefit Plaintiff, or otherwise segregate the funds upon receipt.").

Once Plaintiffs advanced payment to Defendants for the invoices, Plaintiffs were then simply owed a debt under the parties' agreements.  Notably, that debt belonged to NMC, not to Defendants, and the amount that NMC was obligated to pay Plaintiffs was different than the amount advanced by Plaintiffs to Defendants.  *See* Compl. ¶¶37, 41, 45.  Nevertheless, even if the debt owed to Plaintiffs can somehow be attributed to Defendants, a conversion claim fails when it is based on the existence of a mere creditor-debtor relationship among parties.  *See Heriveaux*, 2020 WL 487290, at *8 ("Where there is no present obligation to return the money, but only a debtor-creditor relationship, a claim of conversion will not lie."); *Am. Rubber & Metal Hose Co. v. Strahman Valves, Inc.*, 2011 WL 3022243, at *7 (D.N.J. July 22, 2011) ("Because a monetary loss can be repaid in whole by other money, allegedly converted money is deemed a mere debt unless there is a requirement that the 'identical money' be repaid.").  Plaintiffs' conversion claim should be dismissed for this reason as well.

## J.     The Economic Loss Doctrine Bars Plaintiffs' Tort Claims

Notwithstanding that each of Plaintiffs' causes of action should be independently dismissed as legally insufficient, "the economic loss doctrine bars plaintiffs from recovering in tort economic losses to which their entitlement only flows from contract.  Only tort claims asserting the defendant breached a duty owed to the plaintiff independent of the contractual duties may be alleged alongside a breach of contract claim."  *Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.*, 449 F. Supp. 3d 449, 462 (D.N.J. 2020) (quotations and citations omitted). In other words, "[a] tort claim may only be asserted alongside a breach of contract claim if the

tortious conduct is 'extrinsic' to the contract between the parties." *Meng v. Du*, 2020 WL 4593273, at *5 (D.N.J. Aug. 2020).  The economic loss doctrine applies not only to alleged intentional torts, but also to those sounding in negligence. *Davis v. Bankers Life & Cas. Co.*, 2016 WL 7668452, at *11 (D.N.J. Dec. 23, 2016).

Here, Plaintiffs' common law tort claims are premised exclusively on Defendants' alleged failure to perform under to the parties' respective contracts.  See Compl. ¶¶62-92 (fraud claims based on alleged failure to repay Plaintiffs for invoices issued under parties' contractual agreements); ¶¶93-119 (same for negligence claims); ¶¶120-124 (same for civil conspiracy claim); ¶¶162-175 (same for conversion claims).  Plaintiffs do not allege any misconduct by Defendants that was "extrinsic" to performance of the alleged underlying contracts.  Plaintiffs do not and cannot transform their contract claims into tort claims by simply declaring as they do, in conclusory fashion, that Defendants' alleged misconduct was either "intentional" or "negligent."

The economic loss doctrine bars tort claims under precisely these kinds of circumstances. *See, e.g., Red Hawk Fire*, 449 F. Supp. 3d at 466 (dismissing fraud and fraudulent misrepresentation claims under economic loss doctrine where allegations concerning distributor agreements only involved defendant's "performance under the contract"); *Meng*, 2020 WL 4593273, at *5 ("Since the only alleged misrepresentations involve nonfulfillment of promises set forth in the contract," party asserting fraud claim "cannot state both a breach of contract claim and a tort claim for common law fraud."); *Davis*, 2016 WL 7668452, at *11 (dismissing negligence claim under economic loss doctrine where plaintiff alleged neither an "independent duty owed to" plaintiff nor a "general duty of care").

On this independent ground, the Complaint's tort claims (*i.e.*, the First, Second, Third, Fourth, Fifth, Thirteenth, and Fourteenth Causes of Action) should be dismissed in their entirety.

**K.**       **Plaintiffs Fail to State a Claim for Unjust Enrichment**

"To state a claim under a quasi-contract theory of unjust enrichment, a plaintiff must allege that (1) that the defendant has received a benefit from the plaintiff, and (2) that the retention of the benefit by the defendant is inequitable."   *Davis*, 2016 WL 7668452, at *12(quotations omitted).  "A claim of unjust enrichment will not stand when an express contract exists concerning the identical subject matter."  *Id.* (quoting *Spano v. JP Morgan Chase Bank, NA*, 521 F. App'x 66, 70 (3d Cir. 2013)).  "Although litigants may plead alternative and inconsistent claims, courts have on numerous occasions dismissed under Rule 12(b)(6) unjust enrichment claims that relate to the same subject matter as valid contracts."  *Id.* (citation omitted); *see also In re Gen. Motors LLC Ignition Switch Litig.*, 339 F. Supp. 3d 262, 337 (S.D.N.Y. 2018) (collecting New Jersey case law and finding that "[w]hile a few federal district courts have suggested that a plaintiff may plead unjust enrichment and contract claims in the alternative, the weight of authority indicates that that is the case only when the existence of a valid contract is disputed").

Here, Plaintiffs' unjust enrichment claim arises solely from Plaintiffs' written agreements with Defendants and NMC.  Specifically, Plaintiffs allege that the invoices at issue were all paid pursuant to the terms of the written "programmes" entered into by the parties — *i.e.*, the reverse factoring agreements that governed Plaintiffs relationships with Defendants and NMC.  *See* Compl. ¶¶ 13-15, 153, 158.  The repayment that Plaintiffs now seek from Defendants is owed exclusively under Plaintiffs' agreement with NMC, which was responsible for repaying Plaintiffs for any advances Plaintiffs made on invoices.  *Id.* ¶ 15.  In other words, Plaintiffs' unjust enrichment claim covers the same ground as Plaintiffs' breach of contract claim.  "Even on a 12(b)(6) motion, courts have not hesitated to dismiss quasi-contract claims that are based on the

same facts as a plaintiff's contract claim." *Heyman v. Citimortgage, Inc.*, 2019 WL 2642655, at

*28 n.39 (D.N.J. June 27, 2019) (collecting cases); *Davis*, 2016 WL 7668452, at *12 ("The Third

Circuit has approved of dismissing unjust enrichment claims where, as here, a plaintiff also seeks

relief on a contract") (citing *Estate of Gleiberman v. Hartford Life Ins. Co.*, 94 F. App'x 944 (3d

Cir. 2004)).

Furthermore, because Plaintiffs' unjust enrichment claim simply seeks a payment of

money under the terms of an agreement, the relief sought by Plaintiffs is legal rather than

equitable in nature.  Where a legal remedy is available, the equitable claim of unjust enrichment

is not.  *See In re Gen. Motors LLC*, 339 F. Supp. 3d at 337-38 ("Plaintiffs may not bring unjust

enrichment claims under New Jersey [law] if an adequate legal remedy exists").

Separately, Plaintiffs' unjust enrichment claim fails because Plaintiffs have not, and

cannot, allege that they expected renumeration from Defendants.  As noted, the Complaint pleads

that "NMC agreed to be responsible for paying the full amount of the invoices to Plaintiffs at a

later date in exchange for Plaintiffs making the payments for NMC's orders from Defendants."

Compl. ¶ 15; *see also id.* ¶¶ 37, 41, 45 (payments to Plaintiffs were to be made by NMC).

Nothing in the Complaint — and nothing in Defendants' Supplier Agreements with Plaintiffs —

required repayment for invoices to be made by Defendants, and as a result, Plaintiffs could not

have reasonably expected Defendants to be responsible for such repayments.  The unjust

enrichment claim fails as a matter of law on this basis.  *See Red Hawk Fire & Sec.*, 449 F. Supp.

3d, at 464 (dismissing unjust enrichment claim where, *inter alia*, plaintiff failed to allege that it

"expected remuneration" from defendant under distribution agreements).

Finally, to the extent Plaintiffs purport to assert their unjust enrichment claim as a kind of

tort-based claim rather than a quasi-contract claim, the unjust enrichment is duplicative of

Plaintiffs' other tort claims and fails as a result. *See Neuss v. Rubi Rose, LLC*, 2017 WL 2367056, at *8 (D.N.J. May 31, 2017) (finding unjust enrichment claim duplicative of other tort-based claims and noting that "New Jersey does not recognize unjust enrichment as an independent tort cause of action").

Plaintiffs' unjust enrichment claim should thus be dismissed in its entirety.

## IV.  CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that this Motion to Dismiss be granted in its entirety.

Dated: New York, New York
       February 16, 2021

MEISTER SEELIG & FEIN LLP

By: /s/ Alexander D. Pencu
    Alexander D. Pencu
    Benjamin D. Bianco
    Amit Shertzer
    125 Park Avenue, 7th Floor
    New York, New York 10017
    Tel: (212) 655-3500

*Attorneys for Defendants*